IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND


ASSOCIATION OF COMMUNITY CANCER )
CENTERS, et al.,                )
                                )
          Plaintiffs,           )
     vs.                        )   CIVIL NO.: CCB-20-3531
                                )   Zoom Hearing
ALEX M. AZAR, II, et al.,       )
                                )
          Defendants.           )
_____)


Transcript of Proceedings – Motions Hearing
before the Honorable Catherine C. Blake
Friday, December 18th, 2020
Baltimore, Maryland


APPEARANCES:

For Plaintiff Pharmaceutical Research and Manufacturers of
America:

     John P. Elwood, Esquire
     Allon Kedem, Esquire
     Diana Sterk, Esquire
     Robert Stanton Jones, Esquire

For Plaintiff Global Colon Cancer Association:

     Andrew Zimmitti, Esquire
     Michael S. Kolber, Esquire
     Adam Finkelstein, Esquire

_____

Reported by:

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201
(410) 962-4492

APPEARANCES: (cont'd)

For Plaintiff National Infusion Centers Association:

      Anne Swift, Esquire
      Timothy Cleveland, Esquire

For the Defendant:

      Rachel Westmoreland, Esquire

For Summit On-Site Solutions, LLC, d/b/a Altus Biologies:

      Martin J. Amundson, Esquire

Reported by:

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201
(410) 962-4492

1                      P R O C E E D I N G S
2      (10:12 a.m.)
3              THE COURT:  Good morning, everyone.  Glad to see you
4      all on this video screen here.  I'm going to start by asking
5      counsel, starting with plaintiffs counsel, to identify
6      themselves for the record.
7              MR. ELWOOD:  Your Honor, I'm John Elwood for the
8      Pharmaceutical Research and Manufacturing Association.  I'll
9      be speaking on behalf of all the plaintiffs today.  I'm joined
10     by Allon Kedem and Stanton Jones, and Diana Sterk is also
11     on.
12             THE COURT:  Okay.  Thank you.
13             And speaking for the Government.
14             MS. WESTMORELAND:  Good morning, Your Honor.  My
15     name is Rachel Westmoreland.  And I'll be speaking for
16     defendants today.
17             THE COURT:  All right.  Thank you.
18             Anyone else that would want to introduce themselves?
19             MR. CLEVELAND:  Your Honor, I'm Tim Cleveland, here
20     on behalf of one of the co-plaintiffs, National Infusion
21     Centers Association.  And with me is my colleague Anne Swift,
22     who will also be, along with Mr. Elwood, presenting the
23     argument for the plaintiffs.
24             THE COURT:  Okay.
25             THE COURT:  All right.  Thank you all very much.

1                Let me just make some preliminary observations.

2      Obviously, we're here on an argument relating to the TRO and

3      not preliminary injunction.  There has not been what I would

4      consider to be a sufficient briefing and time to consider all

5      the issues that I would feel comfortable issuing a preliminary

6      injunction.  I am ready to consider the TRO.

7                At least for my purposes, while I'm not going to

8      prevent you from saying what you might like to say about

9      various claims, I'm going to be focused on the alleged

10     violation of the notice and comment under the APA.  I'm not at

11     all sure that I'm ready to address the constitutional claim.

12     And then there's the statutory, whether this is, in fact, a

13     model -- an appropriate model.  I'm more focused, for TRO

14     purposes, on the notice and comment.

15               Obviously, I'm interested, there's always that

16     threshold issue of jurisdiction.  The government says I don't

17     have it and relies on *Illinois Council*.  And I think

18     plaintiffs have a different viewpoint.  So I'm happy to hear

19     about that.  I need, obviously, also, the threshold matter

20     that ties in with irreparable harm.  There's the standing

21     question, exactly what harm are the plaintiffs alleging.  Is

22     it purely the procedural injury?  Are there organizational

23     standing?  Is it representational?  Exactly how we get to that

24     issue is something I also want to hear about.

25               Of course, I'll want to hear from the government in

particular on how they justify the good cause and why this delay is -- why dispensing with notice and comment would help, to put it one way. And those are the obvious issues. Again, just keeping in mind that TRO context.

I'm certainly familiar with these general principles, the prongs of a preliminary injunction. A temporary restraining order test. I'm aware they're the same -- the criteria are the same. But, again, think at the TRO stage, perhaps, I may not have quite the thorough analysis, time to do the thorough analysis that I would like to do. But nonetheless, the principles are the same and there's got to be jurisdiction and standing.

So with that I'm happy to go ahead and start hearing from the plaintiffs.

Mr. Elwood, you need to unmute.

MR. ELWOOD: I'm glad I got that out of the way right at the beginning.

THE COURT: We all do it.

MR. ELWOOD: Subject to the Court's directions and questions I plan to address each of the four factors. But because of the unusual posture of the case, and because it is on a TRO, I thought I'd go in sort of the reverse of the usual order, beginning with the balance of the equities and the public interest -- which of course merge when the government is a party -- and then proceed to irreparable injury and

1    likelihood of success.  I'll try to remember to cover

2    jurisdictional issues and so forth.  But in any event, just

3    prompt me if I overlook something.

4              THE COURT:  Okay.

5              MR. ELWOOD:  In determining whether to briefly

6    preserve the status quo until the PI motion is resolved,

7    basically requires weighing the government's interest in

8    starting on January 1 versus the interest in preserving,

9    during the litigation the PI motion, an existing reimbursement

10   scheme under which millions of Medicare patients with chronic

11   conditions are clinically stable.  And I'll add that prompt

12   entry of the TRO would avoid the disruption that changes in

13   treatment would cause, since we're now two weeks from January

14   1, and as indicated in the declarations, providers may be

15   thinking of the need to transition patients to medications not

16   covered by the MFN rule.

17             We have argued that there's no substantial

18   government interest in beginning on January 1st as opposed to

19   January 14th or even January 28th.  In short, the time

20   crunch -- as I've already discussed in the scheduling call

21   earlier -- this time crunch is the result of an artificial

22   deadline set by the administration when they decided to issue

23   this rule that that they recognize is transformational, by

24   interim final rule on its way out of the office, on Friday

25   after Thanksgiving, taking effect exactly five weeks later,

with two intervening federal holidays. And they knew, of course, it would be subject to legal challenges. The President and Secretary Azar mentioned that at the rollout.

At worst, if the defendants ultimately prevail, then the TRO and preliminary injunction will have merely delayed their preferred regulatory outcome. But that is not a cognizable interest under the *Pennsylvania versus Trump* case cited in our papers. And, of course, CMS's lengthy delays belie any plan of the implementation must be immediate. And I'll add that for a seven-year program that's so disruptive that the agency is taking four years just to phase it in, I think it's very hard for the Government to claim they have a public interest that turns on the plan beginning on any one arbitrary day.

Now, the government has argued that the rush -- they have to rush the rule through to provide economic relief because of the COVID surge. But they've done nothing to tie the COVID surge to how the rule is supposed to provide relief of economic hardship. You know, as a background thing, you know, there was a story on NPR last night about how the economy is continuing to improve. And in any event, most Medicare patients are retired any way and so economic figures matter less to them.

And, in any event, the COVID copay reduction is illusory because as we noted, and the government has not

rebutted, 94 percent of Medicare patients using MFN drugs have supplemental coverage that covers some or all of the cost sharing of Part B drugs.  In addition to that, the copayments won't be coming down immediately, because even the government admits there will be some delay, they said that on page 32 of their opposition, before the manufacturers will reduce the prices of the MFN drugs.  And in any event, as --

THE COURT:  I'm sorry to interrupt you for just a minute, because this may go to the good-cause issue as well, your point is that to the extent there's potentially with a rule like this, where there is a benefit to people in paying less money, you're saying that in the immediate future it's not going to have any effect on Medicare patients, what they pay.

MR. ELWOOD:  Exactly.  Both because they -- 94 percent have supplemental insurance.  And both because the government agrees that there will be some delay before the MFN drugs come down.  And because, as we've extensively documented, providers are going to switch the drugs that aren't covered by the independent rule.  And between those two things, the co-pays are going to stay where they are.  I mean, in any event, it's not a justification for a 14-day or 28-day delay.

And if the government had acted with the dispatch you'd expect when an agency is responding to an emergency,

they would have issued the rule months earlier.  And I want to

point out in particular the interim final rule that the

Department of Labor adopted for measles, which they said was a

response to emergency economic conditions of the pandemic,

they issued that rule on October 8th.  And if CMS had issued

this rule then, the PI would already be fully litigated.  And

we would have a much surer understanding of what was going to

happen in the new year.

Given the weakness of the government's interest in

proceeding on January 1st as opposed to the 14th or 28th, any

equity supporting the TRO would put the public interest in our

favor.  And, in fact, we think the equities are compelling.

Granting the TRO would give the parties and this Court the

time to litigate and decide the preliminary injunction, the

(AUDIO GAP) of the issue, which effects health care of

millions of Americans, and by the government's own estimate 85

billion dollars of (AUDIO GAP).

On our side of the ledger, the rule itself

acknowledges that it's going to effect treatment decisions and

reduce access to covered medications from the very beginning.

By the government's own estimates, which we think are very

low, in year one there will be a 9 percent increase in the

rate at which patients can't access their medications, and

that they'll instead be prescribed alternative therapies.

The TRO is just going to preserve the status quo of

1    care for millions of Americans who are clinically stable.  And

2    as we noted in our papers the *Texas Children's Hospital* case

3    indicated that there's a robust public interest in

4    safeguarding access to health care.  And the *Cardinal Health*

5    case says the public interest is patients obtaining needed

6    medications in a timely manner.

7         Now, rotating on to irreparable harm.  We provided

8    dozens of detailed affidavits just from providers, who

9    provided others from manufacturers, explaining how they're

10   locked into contracts to buy medicines at market prices for

11   months or years to come.  And yet beginning January 1st

12   they're only going to be reimbursed a fraction of what they

13   paid for those medications.  They can't renegotiate contracts

14   on 50 medicines in five weeks, we have numerous experts who

15   say that.  And they can't afford to lose literally thousands

16   of dollars for treatments, which is what is involved in these

17   cases.

18        It means discontinuing, or at the very minimum, very

19   significantly changing the treatment plans for at least tens

20   of thousands of patients on a few weeks notice during a

21   pandemic, when it's harder to move people around and start

22   doing different accommodations.

23        I'm not going to try to belabor this, but I wanted

24   to flag just a few affidavits, the declaration of oncologist

25   Dr. Michael Seiden, that's Exhibit M as in Michael.  It is

supported by a letter signed by oncologists whose practices

treat 644,000 Medicare beneficiaries. And page 2 of the

letter explains the effect of the MFN rule on oncology

patients in particular. I'm just going to read two sentences

if you don't mind.

THE COURT: Sure.

MR. ELWOOD: First, quote, the rule will force

patients to make an impossible choice among untenable options.

One, accept alternative inferior treatment. Two, go elsewhere

for treatment. That's a references to 340B safety net

hospitals. Or three, forego treatment altogether. Any of

those results would detrimentally effect patient care and

outcomes.

THE COURT: I'm sorry, let me interrupt again,

though. Perhaps you're coming to this. I certainly

understand those arguments in the context of the public

interest. Are you just addressing it now in terms of public

interest, or if this is -- how is it irreparable harm to the

clients that you represent, the plaintiffs in this case?

MR. ELWOOD: It's irreparable harm in two respects.

First of all, the Global Colon Cancer Association is a patient

group. It is composed of patient groups and those component

members have individual colon cancer patients. In addition,

GCCA has a support network for patients. In addition to that,

there are -- the providers, there is precedent allowing them

to essentially invoke irreparable harm for patients because of
the closeness of the relationship.

There's cases allowing them to invoke the harms of
patients.  That's the *Richmond Medical Center* case from the
Eastern District of Virginia in '98.  And the *Children's
Hospital of the King's Daughters* case, Eastern District 2017.
Both of those indicate that you -- when you're considering
irreparable injury, you can consider the harm to the patients
that the providers are treating.  They are very intimate
relationships.  Especially for multiple sclerosis patients,
you know, some of these doctors have been dealing with these
patients for ten or 20 years.

In addition to that, the providers themselves have
an interest -- and this is the Baltimore Title X case -- Mayor
and City of Baltimore, Title X case from this district in
2019, that says when you put providers to this choice of
either losing money or providing treatment that they don't
think is medically appropriate, that is irreparable injury.
So I think either of those would constitute irreparable injury
here, Your Honor.

THE COURT:  Okay.

MR. ELWOOD:  The second --

THE COURT:  You think that this is comparable to
the *Casa de Maryland*, there's a recent case in the immigration
context, not in the medical context, but from Judge Xinis of

1    this district discussing organizational and representational

2    standing in slightly more detail.  There's -- I guess, I'd

3    like you focus on that.  Also, is there separate -- is there

4    some organizational standing that you're claiming.  I believe

5    you're partly relying on the procedural injury itself.  I just

6    want to hear a little bit more about those.

7              MR. ELWOOD:  Sure.  Well, I think the associations

8    have standing to represent the interests of their members.

9    Which, again, the providers -- providers association has a

10   very direct injury in that, you know, they -- under very

11   conventional associational standing, they can advance the

12   interest of their members --

13             THE COURT:  Okay.

14             MR. ELWOOD:  -- avoiding harm.  And it's admittedly

15   one rung down for the GCCA.  But it is, nevertheless, it is a

16   patient group that's, you know, has members that themselves

17   represent individual patients.  And given that I think the

18   shortness of time and the preliminary stage of things, I think

19   it's appropriate that a group can represent them.  After all,

20   the rule was issued literally only three weeks ago today.

21             And I think most of these patients don't even know

22   yet what's going to happen to them.  You know, unless their

23   providers have told them, you know, basically this means a

24   choice between an inferior treatment or you having to drive

25   longer distances to, you know, hospitals, unfamiliar

hospitals.  They may not even know what's going on.  So at least for present purposes, I think that this is entirely appropriate to proceed and to consider the harm to patients.

THE COURT:  Okay.

MR. ELWOOD:  The second quote from the oncologist letter I wanted to get to is, quote, if the MFN rules forces practices to substitute alternatives for the listed oncology drugs, patient outcomes will likely be worse.  These are the most effective drugs in the treatment of cancer.  In our collective medical judgment foregoing use of these drugs will lead to decreased life expectancy for many patients, unquote.

The Seiden declaration, I just wanted to note a couple of paragraphs, paragraphs 21 and -- I'm sorry, 20 and 21 of his declaration indicate that U.S. Oncology Network practices and other oncology practices will be forced by the MFN rule to decline treatment for numerous Medicare patients beginning in January of 2021.  So it's an imminent injury.  And he says that it would, quote, have significant negative health impacts on patients, resulting in a reduction in care for cancer patients and a corresponding reduction in favorable outcomes, life expectancy.

I wanted to just focus on two categories of drugs, oncology and the treatment of multiple sclerosis.  For oncology and the treatment of multiple sclerosis.  For oncology 38 of the 50 drugs on the MFN list are oncology drugs.  And as the doctors I quoted above indicated, they're

on the list because they're the most used drug because they're

the best.  And one in particular I wanted to flag is Keytruda,

which is used in treatment of 16 types of tumors.  The FDA has

given Keytruda 15 breakthrough designations, meaning that it

represents a substantial improvement over existing therapies

for serious or life threatening medical conditions.  You can

find that at Exhibit A, Paragraph 34.

Now, I'd like to talk just a little bit about

multiple sclerosis.  The declaration of Dr. Joshua Katz, which

is Exhibit N, as in Nancy, he is a neurologist and co-director

of one of the largest MS treatment centers in New England.  He

notes that the MFN rule will make it impossible to get

Medicare patients with multiple sclerosis two very effective

drugs.

I want to flag one in particular, Ocrevus.  Dr. Katz

explains that Ocrevus is, quote, the only FDA-approved therapy

for primary progressive multiple sclerosis, meaning that

Medicare patients will have no other treatment options.  As a

result, patients who are presently able to live normal,

fulfilling, and productive life will face relentlessly

progressive symptoms that may result in blindness, the

inability to walk, falls, and shortened life expectancy,

unquote.  That's paragraph 10.

Dr. Katz likewise says in paragraph 6 of his

declaration that, quote, implementation of the MFN rule on

January 1st, 2021, will result in a disruption or discontinuation of treatment for thousands of multiple sclerosis patients who are currently clinically stable, unquote.

In paragraph 12 -- and I swear I'm going to stop reading for a while after this -- says that, quote, implementation of the MFN rule on January 1st places my patients at unnecessary risk of relapse and permanent neurologic damage, unquote. I will also note that both Keytruda and Ocrevus are made by Pharma members.

Now, 340B safety net hospitals can purchase drugs at lower cost and they aren't subject to the MFN, so one possibility would be for patients with this conditions, who can't get them through their usual providers, move to 340B centers. And for this purpose I'd like to point out the declarations of Thomas Gallo of the Virginia Cancer Institute and Dr. Salvatore Napoli of a neurological center in Massachusetts.

Mr. Gallo says that at Paragraph 10, and this is Exhibit U, as in umbrella, says quote, sending Medicare patients to other locations is not an alternative. I believe that there is not sufficient capacity in the community to absorb these patients for these services. Also, many Medicare beneficiaries have transportation issues and have already established relationships with treating -- physicians treating

1    their complex diseases.  In addition, in a COVID-19

2    environment, it is unclear that alternative locations would

3    even accept new patients, unquote.  That's Thomas Gallo.

4         Now, Dr. Napoli Exhibit X, as in x-ray, notes that

5    transition to another location can take weeks or months, which

6    is something all of us have experienced when we try to go to a

7    new doctor.  And he adds, quote, as Ocrevus must be

8    administered on a regimented schedule, patients often cannot

9    afford this type of delay.  That's Paragraph 7.  In the age of

10   COVID, these difficulties are even further compounded.

11        Now, I wanted to move on to the providers now.

12   We've already talked a little bit about how providers can

13   invoke the harms to patients and how subjecting them to either

14   losses or altering their medical judgment is itself a

15   cognizable injury under the *Mayor and City Council of*

16   *Baltimore* case.

17        Not only will providers suffer real economic harm,

18   as we indicated in Exhibits J, P, Q, and I think Exhibit O,

19   these community-based care centers are often small businesses

20   reliant on be Part B drug reimbursements just to break even.

21   And they operate on a very thin margin, as indicated in the

22   affidavit or declaration of Joshua Smith, that they operate on

23   a net profit margin of 2 percent.  And that reduction in

24   treatments and reduction in reimbursements would, quote,

25   dramatically marginalize his business's ability to keep it's

doors open in rural locations.

We also have the declaration of Dr. Chandra, an expert economist in the health care field, and Joanna Hiatt Kim of the American Hospital Association. Both of them indicate that payment reduction is particularly difficult for rural locations and these are sort of vulnerable communities. And failure of these rural clinics makes treatment unavailable for a significant geographic areas. So patients will have to travel further.

Finally, manufacturers, I wanted to point to Exhibit C. Paragraph 28, indicates that just one manufacturer, just -- who is a Pharma member, expects to lose $566 million just during 2021. And they indicate at paragraph 33 that a revenue loss of that magnitude would cause that firm to eliminate or narrow existing research projects, forego future projects, and/or reduce the number of employees that they have.

The MFN rule, or at least proceeding by interim final rule also causes irreparable harm to notice and comment rights. The government didn't really go into this much in its opposition, but The National Federation of the Blind cases from this district make it pretty clear that the government, when the government acts without the procedures -- without these kind of procedures it constitutes a distinct risk to a particularized interest of the plaintiff. And in a

particular -- if the regulatory undertaking dramatically alters a complex and far reaching regulatory scheme, that that constitutes an irreparable injury. That second case is a *Northern Mariana Island* case from the District of Columbia.

And even though, you know, we always have the option of submitting comments later, and we will be submitting comments later, the *Northern Mariana Islands* case indicates that it's still an injury because they're far less likely to be receptive to comments. And there is an injury in just not being heard.

*The American Federation of Government Employees* case from the D.C. Circuit says that, permitting a submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rulemaking process in a meaningful way. The law is clear, I think it's the *Northern Mariana Islands* case, that we don't have to show that it would result in any difference.

But I do think, having litigated a bunch of these types of cases, that, you know, discontinuing or significantly altering the treatment for tens or hundreds of thousands of people on just a few weeks notice, when a significant treatment -- a significant risk of permanent physical harm, and doing all of that during a pandemic, would be the sort of thing that you'd have to have a very good explanation for to

survive arbitrary and capricious review after notice of
comment rulemaking. I just, you know, maybe I'm being cocky,
but I just cannot imagine the type of fancy footwork it would
take in explaining why they're proceeding anyway despite those
risks, and having a court say, yeah, it sounds good to us.

THE COURT: So your point is if you had time to
comment and those comments were to be taken seriously, you
would certainly be asking for a longer implementation period?

MR. ELWOOD: Yes, absolutely. I mean, at a bare
minimum. It just makes sense to provide people the time to
renegotiate contracts, so that the -- so that they don't have
to have these disruptive decisions. You know, it's -- they
knew that it was going to be disruptive, that's why they're
phasing it in over four years. But by implementing it in five
weeks, there's an entire additional layer where you could
compromise people's -- you know, compromise the health of
people with chronic conditions, because they just don't have
the time to, you know, assure that they're going to be able to
get the drugs that they continue to need to proceed on a
regular basis just to remain healthy.

Moving on to likelihood of success. I believe we
put forward a pretty compelling case that we're likely to
compel, even just on the narrowest grounds, failure to proceed
by notice and comment, we have a compelling claim. Now,
Congress has recognized that notice-and-comment rulemaking is

particularly important in the Medicare context, because Medicare is the nation's second largest federal program.  And as the Supreme Court said in the *Azar versus Allina Health Services* case, quote, even minor changes to the agency's approach can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate, unquote.  So, again, it shows the need for notice-and-comment rulemaking.

And here the agency has gone hard in exactly the opposite direction.  Instead of restraint they've adopted a rule that they say is transformational.  It's intended to be transformational.  It will effect millions of stakeholders over seven years.  And effect almost a hundred billion dollars in spending in the U.S. economy and they didn't invite or consider public comment before.

Now, the 4th Circuit has indicated in the *North Carolina Grower's Association* case that exceptions to notice-and-comment rulemaking are narrowly construed and only reluctantly countenanced.  And I would say that this rule falls far short of the sort of emergency situation where delay would imminently threaten life or physical property or risk fiscal calamity, that's the *Sorenson Communications* case in the D.C. Circuit, 2014.

CMS's own delays we'd say complete reliance on good cause to dispense of notice-of-comment here.  And I'd just

1    point the Court to the *Chamber of Commerce* case where they

2    rejected reliance on COVID as a basis for claiming good cause,

3    when the rule at issue there was issued almost two months

4    earlier than this one on October 8th, because the rule there

5    had already been delayed more than six months.

6            And I wanted to point out that since at least July

7    2019, when President Trump mentioned the favored nation drug

8    pricing scheme, and announced that they would be issuing an

9    executive order very shortly, that's cited in our brief, it

10   was July 5th, 2019.  And COVID was declared a public health

11   emergency in late January.  I think it's significant that the

12   Cares Act was signed on March 27th, indicating that early in

13   the pandemic everyone knew perfectly well about the economic

14   impact of the pandemic.  It was already clear to Congress and

15   the President they needed to act.

16           And we cited a March report in our reply indicating

17   that infectious disease specialists were already predicting

18   there would be a second wave of infections in the fall.  I

19   knew I was thinking about it already, I had a student going

20   off to college.  So I know it would have had to be -- you

21   know, that regulators would have to know that this was coming,

22   especially health regulators.  And since then, you know, this

23   administration has issued a proposed elicit request comment on

24   the pandemic's effects on a couple of occasions, which was

25   already cited.

We've already talked about how this rule is -- you know, the reason why the government has given for rushing this out is to reduce co-pays. But for a couple of reasons that just doesn't hold together. It's just not going to effect co-pays, and certainly not in the 14-day, 28-day time frame that, you know, we're really talking about here for purposes of the TRO.

And, also, I think it's significant that the Most Favored Nation rule exempts COVID-19 treatment from the rule, because it recognizes that would undermine the rapid availability. So it tends to show that the whole thing is really just -- you know, it just doesn't hang together.

THE COURT: Okay.

MR. ELWOOD: Now, as far as jurisdiction goes, I wanted to talk about -- I don't know if you have a preference what order to address them, but starting with the presentment issue. I think first of all, by its own terms, I don't think that the presentment issue applies here. By its plain terms Section 42, U.S.C., 1395ff(b)(1) applies only to appeals for initial determination of benefits under Medicare Part A and Part B.

I would say this case isn't that. They waive those provisions so that they wouldn't determine benefits. And, in fact, we want them to determine these benefits under Part B, that would avoid all this disruption. That would mean it

1    would be getting paid average sales price. But instead they

2    waive those provisions. And the government admitted in its

3    opposition that we're proceeding instead under a different

4    provision.

5          Now, 1395ii says that the 405(h) limitation on

6    judicial review, quote, shall apply with respect to the

7    subchapter, end quote. It's in Subchapter XVIII of the Social

8    Security Act, which is really the Medicare statute. But the

9    agency action we're challenging was not taken under Subchapter

10   XVIII, it was taken under 42, U.S.C., 1315. The government

11   admits that in opposition page 8. They say, quote,

12   plaintiff's challenge on agency actions taken under 1315a.

13   That is part of Subchapter XI, which falls outside of the

14   cross reference. And it isn't Medicare, it's instead

15   entitled, quote, general provisions, peer review, and

16   administrative simplification. It is substitute for Medicare,

17   it is not Medicare.

18         Second, even if 405(h) applied to Subchapter XI, the

19   channeling requirement is not absolute. That's the *Council*

20   *for Urological Interest* case in the D.C. Circuit we cited. In

21   *Bowen versus Michigan Academy*, the Supreme Court relied on the

22   strong presumption that Congress intends judicial review of

23   administrative actions. Section 405b -- 405 rather, does not

24   preclude a challenge to certain Medicare Part B regulations,

25   because it was impossible to think that Congress intended for

there to be no form to adjudicate statutory and constitutional claims promulgated by the HHS secretary.

And there's no way here for plaintiffs to avail themselves of the Medicare administrative scheme to the particular category of cases at issue here. The only entities able to file claims for administrative review would be those providers and patients who are unhappy with the reimbursement received for specific drugs that they've actually administered.

And as noted in all of our declarations, what's going to happen here is that the MFN rule so heavily penalizes using MFN drugs, they're going to give -- they're going to migrate patients over to less effective treatments. And providers and patients cannot submit reimbursement claims for drugs the MFN rule forces them not to administer. In other words, when they're submitting claims for drugs that aren't on the MFN list, that doesn't give them any ability to challenge the Medicare regulations or reimbursement for a different set of drugs.

In addition, I don't think there's any dispute that pharmaceutical manufacturers are cut out of the administrative review process altogether, because under buy and bill they don't submit the reimbursement. And the D.C. Circuit held in *The Council for Urological Interest* case that, you know, that this whole reimburse -- rather, this whole channeling scheme,

quote, permits nonproviders to seek immediate review in federal court.  So I think, in any event, we would have jurisdiction -- the Court would have jurisdiction under that.

THE COURT:  If I follow the first part of your argument, I might not even really need to get there because the provision on which the government is relying to bar judicial review doesn't apply to the subchapter under which you brought your case.

MR. ELWOOD:  Absolutely.  I think that is absolutely the case.  I mean, the whole reason we're here is because they wanted to dispense of Subchapter XVIII, they wanted to do it under Subchapter XI, under a process they just invented from whole cloth.

And then, finally, I don't think we even need to get to it, but we cited authority that would allow the Court to, even if it just had potential jurisdiction -- and, again, this would only apply to some subset of the plaintiffs -- that the Court could nevertheless issue a status quo order to ensure it had jurisdiction to give effective relief on January 1.  So, I mean, they could still enter the TRO on January 1.  We could file a claim for reimbursement for an MFN drug.  And we would have, you know, jurisdictional every conceivable claim (AUDIO GAP).

That brings us to the other jurisdictional bar, the

one that is specific to this statute. And we would say that it doesn't apply for a couple of reasons. I think the main reason we would say that there's not a problem with it is the *Amgen* line of cases, because even when there is valid jurisdictional bar, courts have repeatedly reviewed the threshold question of, quote, whether the challenged agency action is the sort shielded from review, end quote. And so at a minimum, before we know whether, you know, the Court lacks jurisdiction over the Secretary, you know, adopting a test, it doesn't apply to the decision of whether or not this is actually a test.

And in addition to that, you know, our constitutional claims would survive, there's an extremely strong presumption that unless Congress speaks very clearly that it doesn't bar constitutional claims, and this statute doesn't speak anywhere near clearly enough. And then specifically, I think that it doesn't bar -- the judicial review bar doesn't prohibit us from raising a challenge for failure to abide by notice-and-comment rulemaking.

THE COURT: Just to interrupt you again. Simply for purposes of the TRO, if I agree with you, I don't need to reach the question of whether the jurisdictional bar that specifically applies, you know, is this a model, is this a test at all, reaching that is not necessary if I agree with you for TRO purposes on the notice and comment.

MR. ELWOOD:  I think that that's right.  Although, I confess that I'm (AUDIO GAP) broken up that I'm not entirely sure I understood your question.  I'm sorry.

THE COURT:  It probably wasn't a very good one.  I think the last thing you said is that the -- you're talking about the specific jurisdictional bar in the statute, the one that permits them to do models and tests.  And I think you were saying that even if, ultimately, that would preclude the Court from looking at whether this is a model or a test, it wouldn't bar constitutional claims, in your view.  And it also wouldn't bar the APA issue.  The was this properly adopted without providing for notice and comment.

MR. ELWOOD:  That is absolutely correct.  That's -- it's absolutely correct.  You would still be able to entertain the constitutional claims.  You'd be able to entertain the threshold question of whether or not this was even a valid test.  And you would be able to entertain the challenge to the notice and comment -- the failure to proceed by notice and comment.

The jurisdictional bar, only the first is selection of a model.  And that is very different from how the agency puts the model into force.  You know, it's not a challenge to, you know, the decision to -- how broadly to put it, what drugs to cover.  It's instead just a challenge to the fact that they decided to leapfrog the normal notice-and-comment requirement.

And, you know, as we indicated the *Yale New Haven Hospital* case and the *North Oaks Medical Center* case are both instances where courts have drawn a distinction between the promulgation of the Secretary's rules and the substance of the rules. And those are very different matters. So I think the Court would be able to address that. I mean, you would certainly expect there is a strong presumption of judicial review. You would expect Congress to speak more broadly before they turn off the taps on the administrative review.

In any event, that's all I intended to cover. I do want to note, though, that we have challenged the rule. We still say that this rule is invalid even if it proceed by notice-and-comment. But I think that it becomes a very, very strong argument and it's -- that becomes an especially strong argument because of their decision to proceed by interim final rule.

THE COURT: Let me ask you to address, I gather there are several other similar challenges that have at least been filed in New York, California and maybe D.C. A couple of related questions, what if anything can you tell me about the status, the basis of those cases. And then when you address the government's argument about the scope of any temporary restraining order that I might issue.

MR. ELWOOD: This Court has put us in the pipeline. We filed first. This is the first court having a hearing on

that.  The case in the Southern District, I think that they
have a hearing coming up maybe next week, I want to say on the
22nd.  But I'm not that clear on that.  But this Court is the
first.

          As far as the limitation on the relief.  I know that
the Justice Department is required, for sort of document
reasons to, you know, take a hard line on so-called nationwide
injunctions, which are -- after all it's kind of a misnomer.
It just means that it only applies to these plaintiffs.  But
I'm not sure that the agency would really want to administer a
rule where it carved out just these plaintiffs because, I
mean, all of the associations and all of their members, it
will be a very, very hard thing for them to administer.

          In addition, you know, Pharma members make -- we say
in our complaint exactly how many, but it is a majority of the
drugs on the MFN list.  So, you know, there's not going to be
that much left.  And, you know, the government goes hard for
why it has to have, you know, a nationwide rule that covers 50
drugs for the test to work and to avoid all sorts of, you
know, kind of perverse effects of people trying to work their
way around the rule and gerrymander things.  And if, you know,
the TRO and the PI carved out just the plaintiffs in this
particular litigation, it would really be a very hard thing
for them to administer.

          THE COURT:  Okay.  Thank you.

1          Ms. Swift.

2          MS. SWIFT:  Thank you, Your Honor.  There are just a

3     few things that I would like to emphasize on behalf of my

4     clients, the National Infusion Center Association or NICA.

5     The summary is just that we just can't lose sight of the

6     reality of what rushed implementation of this rule will do to

7     patients and providers on the ground.  And I think Mr. Elwood

8     has done a great job of covering that.  But I'd just like to

9     emphasize that the government has no evidence to rebut the

10    dozens of declarations we have provided from neurologists,

11    oncologists, Harvard professors, and small businesses who

12    treat these patients.

13          If it's helpful to Your Honor, there are three

14    points that I would like to address briefly.  First, how the

15    MFN rule is going to effect the operations of infusion

16    centers.  Second, how it's going to effect infusion centers'

17    ability to treat Medicare patients.  And third, what those

18    effects mean for patients of infusion centers in general.

19          So on the first point operations.  Infusion centers

20    are the heart of Americans' access to life saving IV

21    treatments in their own communities in a safe and

22    cost-effective way.  NICA represents infusion centers big and

23    small in cities like Boston and in rural communities in Idaho,

24    Utah, Wyoming, et cetera.  Regardless of where these infusion

25    centers are located, all are harmed immediately and

irreparably by the MFN rule.

Mr. Elwood addressed sort of the mechanisms of that harm and our declarations go into detail on it. I'm happy to address it more if that's helpful. But the gist of it is this: The infusion therapies that NICA members administer are often medications of last resort for Americans suffering from some of the most complex and chronic medical conditions. I'm thinking specifically of multiple sclerosis, lupus, rheumatoid arthritis. And biologics are the most effective drugs in the fight against progression of those diseases.

But biologics are overwhelmingly targeted by the MFN rule. Which means that infusion centers who already operate on extremely tight margins, as Mr. Elwood mentioned, we've got declarants saying that they're looking at 2 percent already as it is. So on January 1st, these infusion centers are going to be under water by hundreds of millions of dollars. And in the case of especially rural, community-based providers, who are often small businesses, they'll have to close their doors.

The second point, though, is that even for those infusion centers that are able to remain open, almost all will have to discontinue treating Medicare patients entirely. Indeed, the declaration of Dr. Baak, who's a rheumatologist, makes clear that most of these centers are already not scheduling Medicare patients for treatment after January 1st, because they know it will be unsustainable for them to provide

those treatments.

And this is not a matter of altering incentives or pushing health care providers to choose from among different viable options. Many of these treatments that I mentioned are treatments of last resort and there's simply no alternative. As Mr. Elwood mentioned, but I want to note again, because I think it's just such a good example, Ocrevus is the only approved drug for primary progressive multiple sclerosis. So by making Ocrevus financially infeasible for infusion centers to administer, the government is, with five weeks notice, telling them that they can't administer approved care to the hundreds of thousands of patients who are using that medicine.

The government has challenged these examples, suggesting that the declarants are profit-hungry health care executives who could absorb these costs if they wished to, but that just simply isn't the case and there's no evidence to suggest that it is. As I mentioned, our declarants come from academia, from small business, from some of the most esteemed neurologist and rheumatology centers in the country. And they're united around one thing, which is that we have to protect patients and their access to care.

So just briefly, I'd like to talk about those patients. And I know that there has been some discussion about our standing to discuss those harms. I submit that we do have standing for the reasons that Mr. Elwood has

1    addressed.  But, certainly, regardless of whether or not this

2    data goes to irreparable harm or the balance of equities, it's

3    relevant.  On January 1, whether it's because infusion centers

4    are closing their doors or because they are unable to treat

5    Medicare patients, there are going to be dire permanent

6    outcomes for infusion center patients.

7         We provided testimony from a variety of doctors on

8    that, but I'd like to highlight one point in particular.  For

9    multiple sclerosis patients, it is essential that they receive

10   care on a regimented schedule.  So Tysabri, for example, which

11   we discussed in the briefing, is the most effective drug for

12   most patients.  And is administered on a set 28-day schedule.

13   If there is any disruption in that treatment regimen, even by

14   as little as two weeks, MS patients are put at immediate risk

15   of flairs and rebound activity, which could lead to cognitive

16   decline, nerve damage, loss of bladder control, inability to

17   stand.  And all of those symptoms are permanent.  So that's

18   the definition of irreparable harm.

19        In summary, Your Honor, and I'm happy to answer any

20   of your questions, but the MFN rule is not a model or a test.

21   The consequences I just described are the reality for patients

22   at infusion centers across America.  And the government hasn't

23   offered any evidence to the contrary.  So we think this is an

24   emergency and we would ask that you enjoin enforcement of the

25   rule.

1          THE COURT:  Thank you very much.

2          All right.  Let me turn to the government, Ms.

3     Westmoreland.

4          MS. WESTMORELAND:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. SWIFT:  Congress delegated authority to The

7     Center for Medicare and Medicaid Innovation, The Center, to do

8     exactly what they have done here, which is innovate new models

9     in Medicare and Medicaid that will reduce program costs while

10    maintaining a high quality of care.

11         Only five percent of Medicare beneficiaries use the

12    drugs that we are talking about here, but that accounts for 88

13    percent of the Medicare Part B spending.  And the United

14    States is paying sometimes up to twice as much as other

15    developed nations, with similar economic sort of structure as

16    the United States, are paying for these drugs.

17         And the government estimates that by implementing

18    the Most Favored Nation model, it will save seniors tens of

19    billions of dollars over the course of the model.  And save

20    the government as much, if not more.  And recognizing that

21    seniors are facing an economic access crisis to their drugs at

22    a time when they're most important for chronic disease

23    management, because folks with chronic diseases are most at

24    risk for adverse effects of the COVID-19 pandemic, The Center

25    acted amidst a new surge.

1          And I would like to address jurisdiction first, Your

2     Honor, but I don't just want to make sort of threshold point

3     that we're not talking about a small number of seniors who

4     would be benefiting care.  Mr. Elwood and plaintiffs have

5     talked about how it's a small percentage of Medicare

6     beneficiaries who don't have supplemental coverage.  While the

7     amount of seniors who don't have supplemental coverage, who

8     are enrolled in Medicare Part B, it's about 6 million seniors

9     that we're talking about whose co-pays will be reduced with

10     the implementation of the Most Favored Nation model.

11          THE COURT:  Before you move on to jurisdiction,

12     though, let's assume, hypothetically, that is properly adopted

13     new method of payment that cut costs and tied those costs more

14     to what other countries are paying might be a good idea

15     somewhere down the road.  Can you explain to me, and can you

16     point to the evidence in the rule itself, that justifies the

17     good cause exception.  As I understand that, it's a burden on

18     the government, and the burden's got to show how allowing this

19     comment would harm the public interest.

20          I'm not, you know, going to debate with you whether

21     ultimately a rule like this might or might not be a good

22     thing.  But what we're talking about right now, I have a hard

23     time seeing how, as I say, dispensing with notice-and-comment

24     is going to harm the public interest.  And that is my

25     understanding of the problem, that's what you're relying on, I

gather, is the harm to the public interest.

MS. SWIFT:  That's correct, Your Honor.  And CMS, in the rule, explained why going through notice and comment would harm the public interest here.

And so it started by explaining why the population of beneficiaries, generally speaking, seniors here who are taking a drug that's covered under this rule, are having trouble even accessing their medications because of the cost and having to make choices about whether or not to take the medication or reduce the dose.  And then also explains that the economic impact of the COVID-19 pandemic have been severe and are also impacting folks' ability to stretch their budgets to cover increased food prices in addition to their drugs.

And so Mr. Elwood says that economic downturns don't effect seniors.  I think, you know, increased prices of food, which is something that CMS specifically mentioned, I mean, that effects everyone, especially folks on a fixed income. And the hundreds of millions of Medicare beneficiaries who are also eligible for Medicaid.  At any rate --

THE COURT:  What about -- I'm sorry, the evidence that I have, by way of affidavit and so forth, suggests that, in fact, this would, in the short-term, result -- more likely result in denial of access for patients to these drugs, that a number of the providers simply couldn't afford to offer them anymore.  And I think your own rule acknowledges that there

might be some loss of access.  That would be people that would
either have to go to other sources or would just have to
forego the drug.

          So what I'm back to is, what in your rule
demonstrates that, again, that allowing a notice-and-comment
period for what is a huge change, it would appear, in Medicare
Part B reimbursement, harms the public interest?

          MS. SWIFT:  So two points, Your Honor.  First, to
answer your sort of direct question.  It's the new surge in
cases.  And we -- CMS cited in the rule to the CDC's sort
of -- the Centers for Disease Control, their sort of graphs
and data showing that there's been an extreme rise in new
cases recently, at the time that -- right around the time the
rule was issued.

          But I also want to correct sort of the idea that
there's going to be a lot of seniors who are going to lose
access to their drugs.  So plaintiffs make a lot of this part
of the cost-and-benefit analysis in the rule that they claim
stands for the proposition that nine percent of these drug
users are going to lose access.  And first, I want to point
out that that was part of the behavioral model in the rule
that acknowledges that there's a high degree of uncertainty as
to exactly how the market will respond.  And so, you know,
that comes with a grain of salt.

          But also, that's tempered by two things, one is that

in the rule CMS is explicit about how it's going to do continual monitoring and evaluation of access to drugs. And there's a whole section on this in the rule. And so they also say that they're going to continually monitor, that they're going to come up with strategies to address any concerns as they arise. And the statute itself requires that any model under Section -- 42, U.S.C., Section 1315A both decrease cost -- that's one of the statutory goals -- while maintaining or increasing the quality of care. So the statute actually requires that the secretary either terminate or modify the terms of the model if those two prongs are not being met, which explains why CMS is engaging in this sort of monitoring scheme.

But it's important to note that there was already an access crisis for these drugs by their very costs. As I mentioned before, it's astronomical in comparison to what other people are paying in other nations. And so it's the new surge in cases, with the compounding economic effect of the pandemic, that CMS determined was sufficient to forgo notice and comment right now. And I also would like to point out that CMS is still taking comments on this rule, which is something that courts have taken into consideration in determining whether the good cause exception has been satisfied.

And in addition CMS's own -- or not CMS's own, the

1    Medicare statute requires that these rulemakings be completed

2    within a certain amount of time.  So CMS has to finalize or

3    somehow resolve the interim final rule within three years,

4    which is actually less than the time that the model phase-in

5    is sort of taking off.  So there's a few militating factors

6    that sort of rebuts the idea that CMS is just using this as an

7    excuse to implement the rule.  And it's never going to

8    finalize it.  And this is the way to sort of get around

9    notice-and-comment.  And that's just not the case.

10           And I also want to point out that plaintiffs talk in

11   their briefing, and in their argument today, that there has to

12   be some sort of immediate, you know, threat to life or limb

13   and it's not so.  There's -- there has to be good cause shown

14   and it has to be in the public's interest.  And that's what's

15   required by the APA.  And the APA only requires that the

16   agency provide a brief explanation of the good cause that it's

17   found.  And that's supported by 4th Circuit case law.  For

18   example, in *Gould* (phonetic), that agency had a very brief

19   explanation of why it was in the public interest to speed up

20   the implementation of that rule.

21           And a few other points I'd like to rebut --

22           THE COURT:  Which -- which case were you just

23   relying on?  And is that -- I'd be curious to know what you

24   think is your best good cause case.

25           MS. SWIFT:  Well, I think, Your Honor, that to be

frank this has never been -- this exact situation has never been squarely confronted before, except in the sort of *Chamber of Commerce* case that plaintiffs referenced. Though, that case is distinguishable, because while the agency there did rely on the COVID-19 pandemic, the Court ultimately found that it wasn't tied -- the good cause and the economic effects of the pandemic weren't tied to the people who would be effected by that rule. Whereas, here, as I've explained, it effects seniors in particular.

But the case I was just relying on, *Gould*, is a 4 Circuit case, it's *U.S. v. Gould* (phonetic). I don't have the citation right in front of me, but it's cited in our opposition brief. And in that case it was, it was a very sort of short summary of why good cause was required. And the 4th Circuit deferred to the agency and agreed that it was good cause, without sort of requiring all of these heightened elements that plaintiffs claim are required. And so here, CMS acted in the public interest.

So a few other points I want to make on the notice and comment. And then I'm happy to shift to either jurisdiction or irreparable harm, whatever Your Honor would like to hear about. But I want to talk about the delay point. Plaintiffs claim that, you know, we've known about the pandemic for a long time. But while that's true, I don't think any of us, certainly myself, were anticipating the sort

1    of -- sort of wild ride that this pandemic has taken us all on

2    and the magnitude of the sort of surge that is occurring right

3    now in this nation.  So the fact that there's a new surge,

4    that's good enough reason for the agency to want to take

5    action to help people who are affected by the pandemic.

6         Plaintiffs also claim that because the phase-in

7    happens over four years, that's somehow not going to help

8    seniors.  Well, of course, it would be best for everyone's

9    wallets if the drug crisis were cut significantly right now.

10   But CMS was trying to allow the market to recoup, which is why

11   they adopted this phase-in approach.  And there's no

12   requirement, for the good cause exception to apply, that the

13   rule has to, you know, address things at any sort of specific

14   scale.  Being in the public interest now is enough.  And the

15   fact that the rule will be further phased in over time, to

16   allow the market to catch up to it, is not relevant.

17        Plaintiffs also talk a lot about the fact that new

18   COVID drugs are going to be exempt from the rule.  And that's

19   a specific -- there's a whole list of exclusions to the rule,

20   where the agency found for one reason or another that it

21   didn't make sense to include those drugs, maybe they were

22   difficult to manufacture or something like that, and they

23   wouldn't be good candidates to be included in the list here.

24        And that the COVID drug exception is for drugs that

25   are subject to an Emergency Use Authorization, meaning they

haven't even been fully approved yet, or new drugs that
haven't even been approved yet. And the agency wanted to make
sure that those drugs, that are going to need to be widely
distributed, that there wouldn't be anything standing in the
way. But that doesn't mean that those concerns apply to 50
drugs that are extremely well-established and there's no
reason to believe the need for would skyrocket or anything
like that. So it's just not relevant here.

         And then, as I mentioned, the agency is continuing
to take comments and ongoing monitoring to ensure that, you
know, that the statutory goals of reduced costs, while also
maintaining a high quality or even improving a high quality of
care.

         So from here, Your Honor, I'd like to talk about
jurisdiction, if that's okay with you.

         THE COURT:  Sure.

         MS. SWIFT:  So there are two jurisdictional bars
here that are both relevant. So the first is 42, U.S.C.,
Section 405. And I want to make it clear that no one disputes
that Section 405 requires a final decision from the Secretary
before a court -- a claim can be brought in district court.
Plaintiffs don't dispute that. And they also don't dispute
that there are two requirements to Section 405 --

         THE COURT:  -- interrupt for a minute. I don't
think they dispute that 405, what you're talking about is a

1    claim for Social Security disability benefits, for example,

2    that 405 requires agency review before you go to a court.  I

3    think they are very much disputing that Section 405 bars this

4    particular claim.

5              MS. SWIFT:  Right.  So I'll move directly to that,

6    Your Honor.  I just wanted to be clear that there are two

7    components, presentment and exhaustion, and that presentment

8    is not waivable.  But moving on, as you say, claim says their

9    real concern is whether Section 405 has any applicability here

10   at all.  And it does for two reasons.  So, first of all,

11   Section 1395 -- or 1395ff, excuse me, there's a lot of letters

12   and numbers in these statutes, the only reason that that part

13   of the statute doesn't apply yet is because plaintiffs haven't

14   actually presented and exhausted their claim.  If they had

15   done so, which is required by the statute, then the Secretary

16   would have to make a determination under that part of the

17   statute as to whether the claim for reimbursement can go

18   forward.  But regardless --

19             THE COURT:  But they're not making a claim for

20   reimbursement.  That is not their claim.

21             MS. SWIFT:  That's correct, Your Honor.  But they

22   have to go through that process regardless.  And so that

23   brings me to Section 1395ii, which incorporates Section

24   405(h), which requires that all claims that arise under the

25   Medicare statute --

1    THE COURT:  I think it's all claims that arise under

2  this Subchapter.

3    MS. SWIFT:  That's correct, Your Honor.  This

4  Subchapter being the Medicare statute in this case.  And I

5  want to be clear, we acknowledge that Section 1315a is not

6  part of the Medicare statute directly.  But the test that

7  plaintiffs are trying to impose, this sort of like strict

8  textual reading, is inconsistent Supreme Court precedent.

9    So in *Weinberger v. Salfi*, the Supreme Court stated

10  that what arising under this Subchapter, or in this case the

11  Medicare statute, means, is whether the substantive basis for

12  the claim arises under the Medicare statute.  And it does so

13  here for two reasons.

14    First, Section 1315a expressly contemplates

15  interaction with the Medicare statute.  If the Secretary is

16  going to implement a model that is -- you know, the whole

17  purpose of that section is to allow the Secretary to create

18  and implement models that would change, you know, at least on

19  a test scale what is happening technically, you know, in sort

20  of normal course under the Medicare statute, then certainly

21  the substantive basis for what plaintiffs are upset about,

22  which is a model about Medicare payment, certainly that arises

23  under the Medicare statute.

24    And second, the only -- the way that plaintiffs

25  could be theoretically harmed by this is, they go to submit a

claim for reimbursement and are reimbursed under the sort of
model pricing rather than the existing statutory pricing that
was waived for purposes of the model.  So in that sense too,
the substantive basis for their claim does arise under the
Medicare statute.

And then in addition to arguing that the statute
doesn't apply at all, plaintiffs argue that the exception for
sort of having to go through that statute laid out in the
*Illinois Council* case, doesn't apply -- or applies here.  They
argue that the exception applies.  And I want to be clear
about what that exception is.  That exception is that there
would be no review of the underlying claim.

And so, first of all, not all plaintiffs are
pharmaceutical manufacturers.  Actually, none of them are.
They're all sort of membership organizations.  None of them
are pharmaceutical manufacturers or direct providers.  But the
provider organization's members could certainly bring a claim
for reimbursement under the statute and exhaust their sort of
administrative process.  So, you know, certainly Congress
didn't want membership organizations to be able to allow their
providers to flout that just by allowing the provider
organization to bring a suit.

And then the pharmaceutical manufacturer membership
organization Pharma, they argue that while they're
pharmaceutical manufacturers, they're never going to be able

1    to use the sort of exhaustion scheme set forth in the statute.

2    And that's technically true, but that's not the test.  The

3    test is whether there would be no review at all.

4         And courts have found that when other physicians

5    have sufficient incentive to challenge the rule, and could

6    pursue administrative review of individual claims, that the

7    Court lacks subject matter jurisdiction over claims that could

8    be brought by -- that couldn't be brought by a pharmaceutical

9    manufacturer.

10        And it's difficult to imagine how the pharmaceutical

11   manufacturer could argue that physicians wouldn't have

12   sufficient incentive to bring claims through the

13   administrative process, seeing as they're co-plaintiffs with a

14   bunch of membership organizations for providers, and they

15   submitted a number of declarations from providers talking

16   about the sort of alleged harms that they're going to befall.

17   So it's kind of difficult to imagine an argument where those

18   folks don't have an incentive to take this process through the

19   administrative scheme.

20        And plaintiffs make a number of other arguments

21   about, you know, whether they should have to go through the

22   administrative scheme now because of the timing.  But in

23   *Illinois Council*, the Court acknowledged that sometimes it can

24   take a little bit to get through the administrative process.

25   And said that that's no reason to -- sort of no excuse to get

around the clear administrative process that's been set forth

by Congress.

       And also, this bar applies to procedural,

constitutional, and substantive claims.  And with respect to

the constitutional claims in particular, that's important.

Because, though plaintiffs say that all claims have to

specifically arise under the Medicare statute.  Well, if it's

a constitutional claim then it's arising more in the sense

that we're talking about, where the substantive basis for the

claim is the Medicare statute, rather than the text of the

statute itself, which it seems to be the arguments that

plaintiffs are advancing.

       So that's one sort of bar to judicial review -- Your

Honor, you have a question.

       THE COURT:  No, I mean I -- I guess I understand

your argument.  I mean *Illinois Council* itself actually dealt

with claims that were brought under the Subchapter, the

relevant Subchapter, I believe the 1395ff, in which 1395ff is

found.  And I guess you're just saying, and relying on *Salfi*

that because it has to do with Medicare that it should be

considered as arising under the subchapter?

       MS. SWIFT:  Your Honor, it's substantive basis for

the claim is Medicare, if something only tangentially involved

Medicare, I mean, that's not the situation that we're dealing

with here.  We are dealing with something where all of the

sort of alleged harms to plaintiffs are going to arise under the Medicare statute, where Section 1315 explicitly allows the Secretary to waive parts of the Medicare statute. So it's a very close relationship between the provisions of Section 1315 and the provisions that fall under the Medicare statute. And so for those reasons it would apply here.

But, you know, that's one set of jurisdictional or one jurisdiction bar. A second jurisdictional bar actually falls in -- within the section that allows The Center to sort of implement the model that they have implemented here. And that's in Section 1315a(b). So there the selection elements, parameters, scope, and duration, among other things of models implemented by the secretary may not be judicially reviewed.

And this is -- I hear plaintiff's argument to be, and they rely on the D.C. Circuit case, *Amgen,* to be that here the whether or not this is a model merges with the question of whether the Court has jurisdiction over this case. But if that's the test applied to this part of the statute, which we don't think is proper, and I can get to that in a second, it would completely eviscerate the judicial bar. What's the point of the judicial bar if anyone can get around it by saying they're questioning whether something's a model.

And I would only ask the Court to look at why plaintiffs say this isn't a model. They say it's not a model because it lasts too long. And they say it's not a model

because it involves too many people.  Well, the scope and the duration of the model are explicitly barred from judicial review.  So simply saying that, while I'm not sure if it's a model, it would completely eviscerate the scope of the judicial bar here, that Congress instituted presumably because they were concerned that sort of innovating new payment schemes under Medicare may make some people want to question, you know, whether the Secretary had done it the right way.  And so that's sort of an overall.

But talking specifically about the ultra vires statutory claim.  First of all, the Supreme Court was clear in *MCorp. -- Board of Governors v. MCorp,* I believe is the full name -- that when a presumption of judicial review is just that, it's a presumption, and it can be overcome by indicia of clear congressional intent.  And so in the sort of line of D.C. Circuit cases they explain that when the indicia of congressional intent is there, when there's a clear statement that judicial review is barred, you can't overcome that just by saying something is ultra vires.

And even if the Court were to agree that, you know, it should consider this under some sort of ultra vires framework and should consider whether the statutory bar here applies, there's an extremely high standard of review under 4th Circuit precedent for what a ultra vires claim is.  And it's not that the Court thinks that it's the most reasonable

interpretation, or I believe the phrase is, compelling beyond cavil, but it just has to be plausible, it just has to be plausible.  So even if the Court decides that it needs to determine whether the ultra vires exception to the statutory bar applies here, it's a high bar that sort of the thumb falls on the scale of the government.

With respect to plaintiff's constitutional claims.  There's, first of all, it's so clear intent to bar claims relating to scope, elements, parameters of the statute.  But even if the Court doesn't want to address whether constitutional claims are necessarily barred under the statute, we really don't need to answer that question, because plaintiffs constitutional claims are just creative ways to plead their statutory claims in an attempt to evade the judicial bar -- or the bar on judicial review, excuse me.

And so they have a presentment claim.  And their claim that, you know, this should have been properly bicameralism and presentment under the Constitution, that this didn't get properly enacted, that's really just a claim to whether the secretary properly used its waiver authority.  It is just an element of the model that's barred from judicial review.

And they also have a claim that the sort of agency has gone too far, and there's no intelligible principle, and thus it violates the nondelegation doctrine.  And I recognize

that Your Honor isn't necessarily ready to consider the
constitutional claims.  But, I mean, only two cases in our
entire nation's history have found that a statute violated the
nondelegation doctrine.  And they were nothing like the case
we're talking about here.  And so just, you know, sort of
coloring something with the nondelegation words just to get
out of the statutory bar is not consistent with the
congressional intent, as sort of as outlined in Section 1315.

So unless Your Honor has any further, questions
about that, I'll move on to irreparable harm.

THE COURT:  That's fine.

MS. SWIFT:  So plaintiffs went on for some length
this morning about the harm that's going to befall patients,
while not one of the membership organizations here is actually
a patient membership organization.  Even the Global Colon
Cancer Association is an organization that has other
organizations as its members.  And then another rung down,
those organizations might have patients who are members.  And
the other organizations here, only either have providers as
members or have no patient or provider members at all.

All that aside, plaintiffs try to invoke this sort
of third-party irreparable harm standard that has been
extremely narrowly applied by the Supreme Court in the very
specific line of cases dealing with a doctor trying to advance
their patient's right to have an abortion.  And so in

1    *Singleton v. Wulff*, the Supreme Court explained why it's very

2    important that the parties before the Court are the parties

3    that are irreparably harmed.  And they said there that the

4    individuals may not wish to assert their right before the

5    Court and are in the best place to advocate for themselves.

6         Plaintiffs have a lot of declarations where doctors

7    say this is or that is going to happen.  But nobody has taken

8    into consideration the interests of patients, who might not

9    even be able to afford their medications right now, and who

10   might be looking for cost-saving measures.  They haven't

11   considered that and they can't.  And so that is just --

12        THE COURT:  Well, if I may, they certainly have

13   presented evidence of what they believe will be harm to

14   patients.  Other than, again, we're both back to whatever is

15   in the rule, has the government presented any evidence of

16   immediate economic relief for patients?

17        MS. SWIFT:  Well, in the rule, Your Honor, is the

18   government does -- that CMS does state in the rule that there

19   will be an immediate economic benefit for at least some

20   patients because their co-pays are generally 20 percent.  And

21   this is the 6 million Medicare beneficiaries who don't have

22   supplemental coverage, co-pays are generally 20 percent of the

23   cost of a drug.  And in addition, the rule changes this sort

24   of add-on payment that incentivises providers to prescribe a

25   more expensive drug, because it increases the amount of

statutory add-on payment that they'll get.  And the rule also
eliminates co-pays for that add-on.  So there's going to be
immediate financial benefit in both respects for the seniors
who are effected here.

        THE COURT:  That's in the rule, okay.

        MS. SWIFT:  Yes, Your Honor.

        And so the justifications for an exception to the
sort of ironclad rule that parties may not assert the
irreparable harm to a third party are not present here.  So
the Supreme Court has emphasized the relationship between a
provider and a patient, but there is no relationship between a
provider and patient here.  There's a relationship between a
membership organization, that may or may not have sub
organizations who may or may not have patients.  That's very
different than the relationship between a woman and her doctor
who is going to be potentially performing an important
procedure for that woman.

        In addition, there's the ability of the third party
to assert their own right that -- that's an important sort of
aspect in itself.  So the Supreme Court said that even when
that relationship is close, the reason for the prohibition on
asserting a harm to third parties still apply.  There's also
the sort of imminent mootness aspect of it.  I mean, as we all
know, and the Supreme Court acknowledged, that pregnancy is a
time limited condition.  And, whereas, plaintiffs may be

talking about initial chronic -- it's distinguishable from someone who's only going to have a condition for a certain amount of time and then may have to make choices about the procedures at issue there in an even smaller amount of time.

So then moving on to the economic impacts that they say health care providers are going to suffer. Plaintiff has a lot of declarations. The government doesn't dispute that, that they've submitted a lot of declarations that have a lot of statements that say my business is going to be significantly harmed in some way, or even may throw out a number and say my business is going to be harmed, you know, we're going to lose this much money. But that means nothing without context, in the context of irreparable harm.

As a recent, a 2015 decision from a court in the District of Maryland, *Otsuka Pharmaceutical Co.* said, they sort of recognized a case saying that while the Court recognizes that harms may be irreparable, even if damages are difficult to ascertain, the Court ultimately found that the business wasn't impacted sufficiently. And here, it's very important to sort of not eviscerate the fact that this is an extraordinary remedy that plaintiffs are asking for. They're asking for a temporary restraining order and a preliminary injunction, and they're not to be granted lightly.

And if all the plaintiff had to do is show they're going to lose some small amount of money, because their claim

1   for recovery is going to be barred by sovereign immunity, then

2   that would completely eviscerate the fact that is suppose to

3   be an extraordinary remedy --

4           THE COURT:  Ms. Westmoreland, haven't they, again,

5   at least on the affidavits in front of me, haven't they

6   alleged more than that?  Take the community-based infusion

7   centers as an example, aren't there sworn statements telling

8   me that they're likely to go out of business, essentially,

9   suffer very significant financial losses?

10          MS. SWIFT:  There are, Your Honor.  But, frankly,

11  it's a little bit difficult to believe.  And partially that's

12  because of the way that the rule is going to be phased in.  So

13  for the covered drugs, in the first year, it's 75 percent of

14  the cost is going to be based on the price that's currently

15  being paid now.  25 percent is going to be based on this Most

16  Favored Nation cost.  So at a minimum -- I mean, even if the

17  Most Favored Nation cost was zero, they're still getting 75

18  percent of what they're getting now.  Plus it really won't

19  be -- it will be more than that, because it will be balanced

20  with whatever the Most Favored Nation cost is.

21          So I understand plaintiffs to be saying that they're

22  very concerned.  There's no doubt that some may suffer some

23  sort of financial impact.  But if the Secretary wasn't allowed

24  to sort of engage in rulemaking that effected some folks'

25  bottom line, you'd never be able to reduce the cost to the

government or to beneficiaries of Medicare. And so these sort of harms that they're concerned about, you know, should -- that CMS is going to be looking out for whether there actually becomes an access issue for beneficiaries. And that's explained in the rule.

THE COURT: I'm just -- you mentioned phasing. I mean, this sort of gets back to the notice-and-comment reason. But, again, if this is the transformational shift that it's advertised and seems to be, why wouldn't the government want to allow adequate time to renegotiate contracts if they need to, to, you know, adjust their pricing models to meet this -- to meet this new rule.

MS. SWIFT: Well, the government found that it was important for seniors to start getting some relief on the prices. And so I, you know, I understand that, you know, plaintiffs would probably like infinite amount of time to adjust if they had the opportunity. But the reality is that there's a new surge in cases now, and that that is affecting senior's abilities to buy drugs and it's not just seniors are going to be economically benefited by the rule, not just by their co-pay for the drug price itself, but by not having to pay a copay on the additional add-on payment.

And so the manufacturers, for some of the same reasons, make conclusory statements about the amounts and the timing of their losses, but it just doesn't mean much without

comparison to the company's profit.  For example if, you know,
a company loses some amount of money but their profits are in
the billions of dollars, it's not actually terribly
significant the their bottom line.

       And they say they're going to need to evaluate the
effect of the rule on their research and development
strategies, but are they going to need to do that during the
pendency of the litigation on this case.  I mean, they're
asking for a temporary restraining order and then a
preliminary injunction, which presumably are not going to last
forever.  And so it's kind of difficult to believe that
they're making long-term research and development research
strategies right now, while the government is litigating this
case on an emergency basis.

       They also talk about their harms arising from
constitutional injuries.  Mr. Elwood didn't mention that in
his argument, but I want to point out to the Court, in
addition to the fact that they're alleging structural
constitutional harm, not individual harm, that the case they
cited in their reply for the proposition that structural harm
can be relevant for the purposes of irreparable harm is
distinguishable, because in that case the Court specifically
noted that it was the constitutional violation coupled with
the damage incurred that provided the harm, not simply the
structural constitutional principle on its own.

They also alleged harm from not being able to comment on the rule.  But for notice and comment it's not that -- the question is whether they're suffering some sort of irreparable harm.  They're going to be able to comment on the rule as we explained, and CMS is going to have to finalize the rule or make some other determination with respect to the rule within three years.  So the question is whether they're suffering irreparable procedural injury that can't be cured in the future.

And the cases have found that you have to allege more than just a procedural right.  It has to be you're also suffering some sort of injury.  And as we've explained, they're simply not suffering significant enough injuries.  And sort of the number of declarations being submitted, they're all same conclusory statement, it's not enough to show that they're going to be irreparably harmed here.

As far as the balance of the equities, we've discussed this.  You know, plaintiffs say that there's going to be a lot of harm to patients and we sort of discussed that.  But we had also discussed that there's actually no input here from patients who may be looking for cheaper medications.

And then with respect to the scope of relief, the government, it thinks that the -- argues that the relief should be limited to the parties here.  Plaintiffs make arguments about why that would be difficult for the

1    Government.  Well, of course, that's the government's

2    position.  So that's certainly up to the agency as to how they

3    decide to implement the rule from there should the Court not

4    agree with the government's arguments presented today.

5            THE COURT:  Let me ask you about that.  I just have

6    a very hard time understanding how that would work, if the

7    TRO -- if I grant one -- was limited to these plaintiffs.

8    Part of what the government said in explaining its model, is

9    that it needed to be mandatory, it needed to be nationwide.

10   You can -- which makes sense.  I mean, you could think of all

11   kinds of reasons why it would be extremely difficult to

12   administer this kind of a rule or a test on a basis where the

13   drugs, just hypothetically, if the drug's being administered

14   in Maryland, it's one price, and if it's administered in

15   Pennsylvania it's a -- you know, it is subject to the model

16   and it's a different price.  It's hard for me to comprehend

17   how you would even deal with an order that was limited to the

18   people -- the organizations that are in front of the Court

19   right now and still preserve the validity of the test.

20           MS. SWIFT:  Certainly, that's something the agency

21   would have to consider.  But it's important that the agency

22   also not be put in a position of potentially conflicting

23   nationwide injunctions.

24           As you've noted, there are four cases.  Though, this

25   is the first case to have a hearing on an emergency motion,

the case in the Southern District of New York is scheduled for a hearing next Tuesday. The government's opposition to a motion for preliminary injunction and temporary restraining order in the Northern District of California is also due next Tuesday. And a case has been filed in the District Court for the District of Columbia, that while no emergency motion has been filed as of yet, that complaint does contemplate seeking emergency relief.

And so the sort of -- there are sort of important structural principles here at play that the relief be limited to the parties who have standing to assert a claim in this court, particularly in light of the other cases around the country.

THE COURT: If I were to issue the order, I mean, the other thing that I gather is that -- taking the pharmaceutical organization -- a very large number of the pharmaceutical companies and the particular biologics that would be affected by the rule are, in fact, represented in front of me now. Do you know what the difference in scope would be? How much would be left if this -- if an order here were limited just to the parties in front of me?

MS. SWIFT: I'm not sure, Your Honor. But as -- I'm not sure of a particular number. But as I was saying, the administration problem is for the agency to determine sort of after considering any relief -- or I mean, any order that

you -- any order that you may enter, though. Of course, for
the reasons we stated, we ask that you deny plaintiff's motion
for temporary retraining order.

I'd also like to note, Your Honor, you noted that
you intend to just consider the motion for temporary
restraining order now. And, of course, that is your
prerogative, but from the government's position, the Court has
everything it needs really, except for maybe plaintiff's reply
brief on the preliminary injunction to issue an order on both
the TRO and the preliminary injunction.

THE COURT: Okay. Thank you. Thank you very much,
Ms. Westmoreland.

MS. WESTMORELAND: Thank you.

THE COURT REPORTER: Judge, it's Christine. I just
wanted to make sure to say that if Mr. Elwood is going to
argue again, I need him to slow down a lot and also speak
louder.

THE COURT: Thank you very much for bringing that up
and I will ask Mr. Elwood to be sure to do that. Speak more
slowly and loudly.

MR. ELWOOD: Okay. I'm sorry about that. I'm a
former high school debater and I have never been fully cured
of my fast talking. But I can at least try to be louder.

I would like to start with what you didn't really
didn't hear from the government, which is a compelling

explanation of why we can't have a 14-day or 28-day delay.
She invoked copayments that, for the reasons indicated, drug
prices are not going to go down, either for the MFN drugs, the
government admitted that at page 32 of its opposition, and
it's not going to go down if people are moved off of MFN drugs
onto less effective alternatives --

          THE COURT:  Let me interrupt for just a minute.  Can
the court reporter -- is this any better.

          THE COURT REPORTER:  It's marginally better.

          MR. ELWOOD:  Okay.  I'll slow down even more.

          In any event, it's not going to do anything during
the 14- and 28-day period.

          And the government indicated that copayments are 20
percent of the payment, but that is only for people who don't
have supplemental insurance.  Supplemental insurance covers
some or all of it.  And, again, 94 percent of Medicare
beneficiaries have this kind of supplemental insurance.  And I
have a cite for you for that.  I thought I did.  It is the
Spiegel affidavit Exhibit L, Paragraph 24.

          Now, when the government was talking about how the
absence of notice-and-comment rulemaking is not all that
harmful, because, for example, the agency is reportedly
monitoring access issues as things go on.  I want to emphasize
again what kind of harm we're talking about for even short
delays.

We have the affidavit that indicated that Ocrevus
needs to be administered every 28 days or else people's
multiple sclerosis can start declining right now.  It's hard
to take too seriously the agency's monitoring obligations.
And we have submitted a letter by doctors whose practices
treat 624,000 Medicare recipients, saying that it's going to
harm their ability to provide needed cancer drugs to those
patients.

So, I mean, if this already doesn't have alarm bells
ringing at CMS, I don't know what exactly it's going to take
for those kind of signals to go off.  In any event, the
comment period doesn't even close until January 26, which is,
you know, at a point at which there are going to be a lot of
people who need their Ocrevus.  And who are going to be given
something else that doesn't work, that isn't even certified
for that application, or just nothing at all, or they're going
to have to start going to a 3040B hospital.

Now, and I apologize if this is a little bit
disjointed, but I am just going to be addressing things in the
order they came in.  Ms. Westmoreland talks about the
jurisdictional issues.  And specifically the 1395ff issue,
which is the presentment issue.  She accused us of a
excessively literal reading of the statute.  But I think that,
you know, I will plead guilty to that, that it is a literal
reading of the statute.  And when you consider that what we're

talking about here is you construe -- you strictly construe statutes in favor of jurisdiction.

And when -- and in this case there's no question that the judicial bar doesn't apply to provisions in the subchapter, under which this test authority -- this test is being established. And the -- they say what is the substantive basis for the claim. Again, we're not suing because of Medicare Part B benefits, we're suing because they set up a test under Subchapter XI that we think is illegal. So our substantive basis for our claim arises under Subchapter XI. It is not covered by the presentment issue.

Similarly, the judicial bar in 1315a(b) doesn't apply, because she says that, you know, by challenging whether it's a test at all is a challenge to the selection. But again, I think that if you look at -- you strictly construe that provision, we're not quibbling about particular elements of the test, you know, about which hospitals it applies to or, you know, which drugs it applies to in particular. We're raising a challenge because it applies to 75 percent of Medicare spending, but it's nationwide, despite the fact that nationwide tests are supposed to come in phase 2.

And that it apply -- that it is just so broad and so sweeping, it is 250 times bigger than any previous exercise of this model authority that we know of. So they can say model means, you know, a one-to-one model that covers -- it's as big

as the whole country, it's as big as Medicare Part B, but in
all the time they've had this authority, they've used it for
much, much tinier projects.

Now, with respect to whether or not we can assert
the claims, or at least we can invoke the harms to plaintiffs,
*Singleton v. Wulff*, I don't remember that case super well, but
I think that that's a third party standing case as opposed to
an injunctive relief case.  And we have cited cases that the
government has not rebutted, both from the Eastern District of
Virginia in '98 and 2017, that say that health care providers
can invoke harms to patients for purposes of preliminary
relief.

And I think that there are reasons for drawing
distinctions between, you know, bringing a suit in their name,
or bringing a suit to challenge that, and saying that, you
know, my inability to provide these drugs is going to harm the
person who doesn't get them as well.  And that is wholly apart
from the fact that there's the Mayor and City of Baltimore
case that indicates in the Title X context that -- from just
last year -- that if you put a doctor to the choice of give up
money or give a medically inappropriate treatment, that that
is itself irreparable harm.  So I think we've established a
pretty compelling claim for irreparable harm.

Now, this is a relatively minor point at this
juncture, but the government has said, you know, they

literally said that we lose a little bit of money. And they
say we put it to just a single affidavit from one of the
member companies of Pharma, that says that it's going to lose
in the first year $566 million. And sure, it's -- you know,
it's not going to put them out of business, but it is
irreparable. And it also is enough money -- I mean, that
amount of money alone could fund, you know, basically the
production of almost an entire new medicine.

        And the government argued that the affidavits say,
you know, at some point in the future they'll do that. But
Dr. Chandra, who is a health care economist says that's going
to happen now. You know, when somebody knows they're going to
be losing $566 million over the course of the next year, that
affects spending now. You don't wait until the end of year
and say, oh, I guess I'm going to have to tighten my belt.
When you know something is going to happen, that a legal
regime is going to do this --

        THE COURT: Slow down.

        MR. ELWOOD: -- it effects things. And that is only
one example.

        In any event, Your Honor, that's all that I have.
But I would just, again, reiterate when we're talking about
the balance of equities, the government has pointed to nothing
that would keep us from being able to litigate the PI on a
sane schedule, a sane but fast schedule, and allow a 14- to

1    28-days respite from this while the Court is deciding what to

2    do with a program, again, under which millions of people are

3    clinically stable now might not be beginning the first week of

4    January, and which is responsible for such a huge part of the

5    economy.  Thank you, Your Honor.

6            THE COURT:  Thank you very much.  I appreciate

7    everyone's jumping on this quickly.  We are trying to do the

8    same.  And the argument's been helpful.  We'll continue to

9    digest that and all your papers, you will get a decision next

10   week, as early as possible.  Definitely before the 24th.  So I

11   will get something out for you as soon as I can.  Thank you.

12           MR. ELWOOD:  Thank you, Your Honor.

13           THE COURT:  Ms. Carter.

14           THE CLERK:  This Honorable Court is adjourned.

15   Thank you.

16           (The proceedings were concluded at 11:55 a.m.)

17

18           I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

19

20           _____/s/_____
                    Christine T. Asif
                 Official Court Reporter

21

22

23

24

25

< Dates >
January 1 6:8, 6:13,
    26:20, 26:21,
    34:3.
January 14th 6:19.
January 1st 6:18,
    9:10, 10:11, 16:7,
    32:15, 32:24.
January 1st, 2021
    16:1.
January 26 64:12.
January 28th 6:19.
July 2019 22:6.
July 5th, 2019
    22:10.
March 27th 22:12.
October 8th 9:5,
    22:4.
$566 18:12, 67:4,
    67:13.
'98 66:10.
'98. 12:5.
(10:12 3:2.
.

< 1 >.
10 16:19.
10. 15:23.
101 1:46, 2:47.
11:55 68:16.
12 16:5.
1315 49:2, 49:4.
1315. 24:10, 52:8.
1315a 24:12, 39:7,
    45:5, 45:14.
1315a(b 49:11,
    65:12.
1395 44:11.
1395ff 44:11, 48:18,
    64:21.
1395ff(b)(1 23:19.
1395ii 24:5,
    44:23.
14- 63:12, 67:25.
14-day 8:22, 23:5,
    63:1.
14th 9:10.
15 15:4.
16 15:3.
.

.
< 2 >.
2 11:2, 17:23,
    32:14.
2. 65:21.
20 12:12, 14:13,
    53:20, 53:22,
    63:13.
2014. 21:23.
2015 55:14.
2017 66:10.
2017. 12:6.
2019 12:16.
2020 1:19.
2021. 14:17,
    18:13.
21 14:13, 14:14.
21201 1:47, 2:48.
22nd 30:3.
24. 63:19.
24th 68:10.
25 56:15.
250 65:23.
28 18:11, 64:2.
28-day 8:22, 23:5,
    34:12, 63:1,
    63:12.
28-days 68:1.
28th 9:10.
.

.
< 3 >.
3040B 64:17.
32 8:5, 63:4.
33 18:13.
34. 15:7.
340B 11:10, 16:11,
    16:14.
38 14:24.
.

.
< 4 >.
4 41:10.
405 24:23, 43:20,
    43:23, 43:25,
    44:2, 44:3,
    44:9.
405(h 24:5, 24:18,
    44:24.
405. 43:19.

405b 24:23.
410 1:48, 2:49.
42 23:19, 24:10,
    39:7, 43:18.
4th 1:46, 2:47,
    21:16, 40:17,
    41:14, 50:24.
.

.
< 5 >.
50 10:14, 14:24,
    30:18, 43:5.
.

.
< 6 >.
6 15:24, 36:8,
    53:21.
624,000 64:6.
644,000 11:2.
.

.
< 7 >.
7. 17:9.
75 56:13, 56:17,
    65:19.
.

.
< 8 >.
8. 24:11.
85 9:16.
88 35:12.
.

.
< 9 >.
9 9:22.
94 8:1, 8:15,
    63:16.
962-4492 1:48,
    2:49.
_____/s/_____
    _____ 68:22.
.

.
< A >.
a.m. 3:2, 68:16.
abide 27:19.
abilities 57:19.
ability 17:25,
    25:17, 31:17,
    37:12, 54:18,

64:7.
able 15:19, 20:18,
25:6, 28:14,
28:15, 28:17,
29:6, 32:20,
46:20, 46:25,
53:9, 56:25, 59:1,
59:4, 67:24.
abortion 52:25.
above 14:25.
above-entitled
68:20.
absence 63:21.
absolute 24:19.
Absolutely 20:9,
26:10, 28:13,
28:14.
absorb 16:23,
33:15.
academia 33:18.
Academy 24:21.
accept 11:9, 17:3.
access 9:20, 9:23,
10:4, 31:20,
33:21, 35:21,
37:23, 38:1,
38:17, 38:20,
39:2, 39:15, 57:4,
63:23.
accessing 37:8.
accommodations
10:22.
accounts 35:12.
accused 64:22.
acknowledge 45:5.
acknowledged 47:23,
54:24.
acknowledges 9:19,
37:25, 38:22.
across 34:22.
Act 22:12, 22:15,
24:8.
acted 8:24, 35:25,
41:18.
action 24:9, 27:7,
42:5.
actions 24:12,
24:23.
activity 34:15.
acts 18:23.

Actually 25:8,
27:11, 39:9, 40:4,
44:14, 46:14,
48:16, 49:8,
52:14, 57:3, 58:3,
59:20.
Adam 1:36.
add 6:11, 7:10.
add-on 53:24, 54:1,
54:2, 57:22.
addition 8:3, 11:23,
11:24, 12:13,
17:1, 25:20,
27:12, 30:14,
37:13, 39:25,
46:6, 53:23,
54:18, 58:18.
additional 20:15,
57:22.
address 4:11, 5:20,
23:16, 29:6,
29:17, 29:21,
31:14, 32:4, 36:1,
39:5, 42:13,
51:10.
addressed 32:2,
34:1.
addressing 11:17,
64:19.
adds 17:7.
adequate 57:10.
adjourned 68:14.
adjudicate 25:1.
adjust 57:11,
57:17.
administer 25:15,
30:10, 30:13,
30:24, 32:5,
33:10, 33:11,
60:12.
administered 17:8,
25:9, 34:12,
60:13, 60:14,
64:2.
administration 6:22,
22:23, 61:24.
administrative
24:16, 24:23,
25:4, 25:6, 25:21,
29:9, 46:19, 47:6,

47:13, 47:19,
47:22, 47:24,
48:1.
admits 8:5, 24:11.
admitted 24:2,
63:4.
admittedly 13:14.
adopted 9:3, 21:10,
28:11, 36:12,
42:11.
adopting 27:9.
advance 13:11,
52:24.
advancing 48:12.
adverse 35:24.
advertised 57:9.
advocate 53:5.
affected 42:5,
61:18.
affecting 57:18.
affects 67:14.
affidavit 17:22,
37:21, 63:19,
64:1, 67:2.
affidavits 10:8,
10:24, 56:5,
67:9.
afford 10:15, 17:9,
37:24, 53:9.
age 17:9.
agency 7:11, 8:25,
19:14, 21:4, 21:9,
24:9, 24:12, 27:6,
28:21, 30:10,
40:16, 40:18,
41:4, 41:15, 42:4,
42:20, 43:2, 43:9,
44:2, 51:23, 60:2,
60:20, 60:21,
61:24, 63:22,
64:4.
ago 13:20.
agree 27:21, 27:24,
50:20, 60:4.
agreed 41:15.
agrees 8:17.
ahead 5:13.
al 1:6, 1:11.
alarm 64:9.
ALEX M. AZAR, II

1:11.
allege 59:10.
alleged 4:9, 47:16,
    49:1, 56:6,
    59:1.
alleging 4:21,
    58:18.
Allina 21:3.
Allon 1:28, 3:10.
allow 26:16, 42:10,
    42:16, 45:17,
    46:20, 57:10,
    67:25.
allowed 56:23.
allowing 11:25,
    12:3, 36:18, 38:5,
    46:21.
allows 49:2, 49:9.
almost 21:13, 22:3,
    32:20, 67:8.
alone 67:7.
already 6:20, 9:6,
    16:24, 17:12,
    22:5, 22:14,
    22:17, 22:19,
    22:25, 23:1,
    32:12, 32:14,
    32:23, 39:14,
    64:9.
altering 17:14,
    19:21, 33:2.
alternative 9:24,
    11:9, 16:21, 17:2,
    33:5.
alternatives 14:7,
    63:6.
alters 19:2.
Although 28:1.
altogether 11:11,
    25:22.
Altus 2:13.
America 1:25,
    34:22.
American 18:4,
    19:11.
Americans 9:16,
    10:1, 31:20,
    32:6.
Amgen 27:4, 49:15.
amidst 35:25.

among 11:8, 33:3,
    49:12.
amount 36:7, 40:2,
    53:25, 55:3, 55:4,
    55:25, 57:16,
    58:2, 67:7.
amounts 57:24.
Amundson 2:15.
analysis 5:10,
    38:18.
and/or 18:16.
Andrew 1:34.
Anne 2:5, 3:21.
announced 22:8.
answer 34:19, 38:9,
    51:12.
anticipate 21:6.
anticipating
    41:25.
anyway 20:4.
APA 4:10, 28:11,
    40:15.
apart 66:17.
apologize 64:18.
appeals 23:19.
appear 38:6.
APPEARANCES 1:23,
    2:1.
applicability
    44:9.
application 64:16.
applied 24:18,
    49:18, 52:23.
applies 23:18,
    23:19, 27:23,
    30:9, 46:9, 46:10,
    48:3, 50:23, 51:5,
    65:17, 65:18,
    65:19.
apply 24:6, 26:8,
    26:18, 27:2,
    27:10, 42:12,
    43:5, 44:13, 46:7,
    46:9, 49:6, 54:22,
    65:4, 65:13,
    65:22.
appreciate 68:6.
approach 21:5,
    42:11.
appropriate 4:13,

12:18, 13:19,
    14:3.
approved 33:8,
    33:11, 43:1,
    43:2.
arbitrary 7:14,
    20:1.
areas 18:8.
argue 46:7, 46:10,
    46:24, 47:11,
    62:16.
argued 6:17, 7:15,
    67:9.
argues 59:23.
arguing 46:6.
argument 3:23, 4:2,
    26:6, 29:14,
    29:15, 29:22,
    40:11, 47:17,
    48:16, 49:14,
    58:17, 68:8.
arguments 11:16,
    47:20, 48:11,
    59:25, 60:4.
arise 39:6, 44:24,
    45:1, 46:4, 48:7,
    49:1.
arises 45:12, 45:22,
    65:10.
arising 45:10, 48:8,
    48:21, 58:15.
around 10:21, 30:21,
    33:20, 38:13,
    40:8, 48:1, 49:21,
    61:12.
arthritis 32:9.
artificial 6:21.
ascertain 55:18.
aside 52:21.
Asif 1:44, 2:45,
    68:18, 68:23.
aspect 54:20,
    54:23.
assert 53:4, 54:8,
    54:19, 61:11,
    66:4.
asserting 54:22.
Association 1:32,
    2:3, 3:8, 3:21,
    11:21, 13:9, 18:4,

21:17, 31:4,
52:16.
ASSOCIATION OF
COMMUNITY 1:5.
associational
13:11.
associations 13:7,
30:12.
assume 36:12.
assure 20:18.
astronomical
39:16.
attempt 51:14.
AUDIO 9:15, 9:17,
26:23, 28:2.
authority 26:16,
35:6, 51:20, 65:5,
65:24, 66:2.
Authorization
42:25.
avail 25:3.
availability
23:11.
average 24:1.
avoid 6:12, 23:25,
30:19.
avoiding 13:14.
aware 5:7.
Azar 7:3, 21:3.
.
.
< B >.
B. 23:21.
Baak 32:22.
back 38:4, 53:14,
57:7.
background 7:19.
balance 5:23, 34:2,
59:17, 67:23.
balanced 56:19.
Baltimore 1:20,
1:47, 2:48, 12:14,
12:15, 17:16,
66:18.
bar 26:7, 26:25,
27:5, 27:15,
27:17, 27:18,
27:22, 28:6,
28:10, 28:11,
28:20, 48:3,

48:13, 49:8,
49:20, 49:21,
50:5, 50:22, 51:5,
51:8, 51:15, 52:7,
65:4, 65:12.
bare 20:9.
barred 50:2, 50:18,
51:11, 51:21,
56:1.
bars 43:17, 44:3.
based 56:14,
56:15.
basically 6:7,
13:23, 67:7.
basis 20:20, 22:2,
29:21, 45:11,
45:21, 46:4, 48:9,
48:22, 58:14,
60:12, 65:7,
65:10.
becomes 29:13,
29:14, 57:4.
befall 47:16,
52:13.
beginning 5:17,
5:23, 6:18, 7:13,
9:20, 10:11,
14:17, 68:3.
behalf 3:9, 3:20,
31:3.
behavioral 38:21.
belabor 10:23.
belie 7:9.
believe 13:4, 16:21,
20:21, 43:7,
48:18, 50:12,
51:1, 53:13,
56:11, 58:11.
bells 64:9.
belt 67:15.
beneficiaries 11:2,
16:24, 35:11,
36:6, 37:6, 37:18,
53:21, 57:1, 57:4,
63:17.
benefit 8:11, 53:19,
54:3.
benefited 57:20.
benefiting 36:4.
benefits 23:20,

23:23, 23:24,
44:1, 65:8.
best 15:2, 40:24,
42:8, 53:5.
better 63:8, 63:9.
beyond 51:1.
bicameralism
51:18.
big 31:22, 65:25,
66:1.
bigger 65:23.
bill 25:22.
billion 9:17,
21:13.
billions 21:5,
35:19, 58:3.
biologics 32:9,
32:11, 61:17.
Biologies 2:13.
bit 13:6, 15:8,
17:12, 47:24,
56:11, 64:18,
67:1.
bladder 34:16.
Blind 18:21.
blindness 15:21.
Board 50:12.
Boston 31:23.
bottom 56:25,
58:4.
Bowen 24:21.
break 17:20.
breakthrough 15:4.
brief 22:9, 40:16,
40:18, 41:13,
62:9.
briefing 4:4, 34:11,
40:11.
briefly 6:5, 31:14,
33:22.
bring 46:17, 46:22,
47:12.
bringing 62:18,
66:14, 66:15.
brings 26:25,
44:23.
broad 65:22.
broadly 28:23,
29:8.
broken 28:2.

brought 26:9, 43:21, 47:8, 48:17.
budgets 37:12.
bunch 19:19, 47:14.
burden 36:17, 36:18.
business 17:25, 33:18, 55:9, 55:11, 55:19, 56:8, 67:5.
businesses 17:19, 31:11, 32:18.
buy 10:10, 25:22, 57:19.
.
.
< C >.
C. 18:11.
calamity 21:22.
California 29:19, 61:4.
call 6:20.
Cancer 1:5, 1:32, 11:21, 11:23, 14:9, 14:20, 16:16, 52:16, 64:7.
candidates 42:23.
capacity 16:22.
capricious 20:1.
Cardinal 10:4.
care 9:15, 10:1, 10:4, 11:12, 14:19, 17:19, 18:3, 33:3, 33:11, 33:14, 33:21, 34:10, 35:10, 36:4, 39:9, 43:13, 55:6, 66:10, 67:11.
Cares 22:12.
Carolina 21:17.
Carter 68:13.
carved 30:11, 30:22.
Casa 12:24.
cases 10:17, 12:3, 18:21, 19:20, 25:5, 27:4, 29:21,

38:10, 38:13, 39:18, 50:16, 52:2, 52:24, 57:18, 59:10, 60:24, 61:12, 66:8.
catch 42:16.
categories 14:22.
category 25:5.
Catherine C. Blake 1:18.
cause 5:1, 6:13, 18:14, 21:25, 22:2, 36:17, 39:23, 40:13, 40:16, 40:24, 41:6, 41:14, 41:16, 42:12.
causes 18:19.
cavil 51:2.
CCB-20-3531 1:9.
CDC 38:10.
Center 12:4, 16:17, 29:2, 31:4, 34:6, 35:7, 35:24, 49:9.
Centers 1:6, 2:3, 3:21, 15:11, 16:15, 17:19, 31:16, 31:18, 31:19, 31:22, 31:25, 32:12, 32:15, 32:20, 32:23, 33:9, 33:19, 34:3, 34:22, 38:11, 56:7.
certain 24:24, 40:2, 55:2.
Certainly 5:5, 11:15, 20:8, 23:5, 29:7, 34:1, 41:25, 45:20, 45:22, 46:17, 46:19, 53:12, 60:2, 60:20.
certified 64:15.
certify 68:18.
cetera 31:24.
challenge 24:12,

24:24, 25:17, 27:18, 28:17, 28:22, 28:24, 47:5, 65:14, 65:19, 66:15.
challenged 27:6, 29:11, 33:13.
challenges 7:2, 29:18.
challenging 24:9, 65:13.
Chamber 22:1, 41:2.
Chandra 18:2, 67:11.
change 38:6, 45:18.
changes 6:12, 21:4, 53:23.
changing 10:19.
channeling 24:19, 25:25.
cheaper 59:21.
Children 10:2, 12:5.
choice 11:8, 12:16, 13:24, 66:20.
choices 37:9, 55:3.
choose 33:3.
Christine 1:44, 2:45, 62:14, 68:18, 68:23.
chronic 6:10, 20:17, 32:7, 35:22, 35:23, 55:1.
Circuit 19:12, 21:16, 21:23, 24:20, 25:23, 40:17, 41:11, 41:15, 49:15, 50:16, 50:24.
citation 41:12.
cite 63:18.
cited 7:8, 22:9, 22:16, 22:25, 24:20, 26:16, 38:10, 41:12, 58:20, 66:8.
cities 31:23.

City 12:15, 17:15, 66:18.
CIVIL 1:9.
claiming 13:4, 22:2.
claims 4:9, 25:2, 25:6, 25:14, 25:16, 27:13, 27:15, 28:10, 28:15, 44:24, 45:1, 47:6, 47:7, 47:12, 48:4, 48:5, 48:6, 48:17, 51:7, 51:8, 51:11, 51:13, 51:14, 52:2, 66:5.
clear 18:22, 19:16, 22:14, 30:3, 32:23, 43:19, 44:6, 45:5, 46:10, 48:1, 50:11, 50:15, 50:17, 51:8.
clearly 27:14, 27:16.
CLERK 68:14.
Cleveland 2:6, 3:19.
clients 11:19, 31:4.
clinically 6:11, 10:1, 16:3, 68:3.
clinics 18:7.
close 32:18, 49:4, 54:21, 64:12.
closeness 12:2.
closing 34:4.
cloth 26:14.
CMS 7:8, 9:5, 21:24, 37:2, 37:16, 38:10, 39:1, 39:12, 39:19, 39:21, 39:25, 40:2, 40:6, 41:17, 42:10, 53:18, 57:3, 59:5, 64:10.
co-director 15:10.
co-pay 57:21.

co-pays 8:21, 23:3, 23:5, 36:9, 53:20, 53:22, 54:2.
co-plaintiffs 3:20, 47:13.
Co. 55:15.
cocky 20:2.
cognitive 34:15.
cognizable 7:7, 17:15.
colleague 3:21.
collective 14:10.
college 22:20.
Colon 1:32, 11:21, 11:23, 52:15.
coloring 52:6.
Columbia 19:4, 61:6.
comes 38:24.
comfortable 4:5.
coming 8:4, 11:15, 22:21, 30:2.
comment 4:10, 4:14, 5:2, 18:19, 20:2, 20:7, 20:24, 21:15, 22:23, 27:25, 28:12, 28:18, 28:19, 36:19, 37:3, 39:20, 41:20, 59:2, 59:4, 64:12.
comments 19:6, 19:7, 19:9, 20:7, 39:21, 43:10.
Commerce 22:1, 41:3.
Communications 21:22.
communities 18:6, 31:21, 31:23.
community 16:22.
community-based 17:19, 32:17, 56:6.
companies 61:17, 67:3.
company 58:1, 58:2.
comparable 12:23.

comparison 39:16, 58:1.
compel 20:23.
compelling 9:12, 20:22, 20:24, 51:1, 62:25, 66:23.
complaint 30:15, 61:7.
complete 21:24.
completed 40:1.
completely 49:20, 50:4, 56:2.
complex 17:1, 19:2, 32:7.
component 11:22.
components 44:7.
composed 11:22.
compounded 17:10.
compounding 39:18.
comprehend 60:16.
compromise 20:16.
conceivable 26:23.
concern 44:9.
concerned 50:6, 56:22, 57:2.
concerns 39:5, 43:5.
concluded 68:16.
conclusory 57:24, 59:15.
condition 54:25, 55:2.
conditions 6:11, 9:4, 15:6, 16:13, 20:17, 32:7.
confess 28:2.
conflicting 60:22.
confronted 41:2.
Congress 20:25, 22:14, 24:22, 24:25, 27:14, 29:8, 35:6, 46:19, 48:2, 50:5.
congressional 50:15, 50:17, 52:8.
consequences 34:21.
consider 4:4, 4:6, 12:8, 14:3, 21:15,

50:21, 50:22,
52:1, 60:21, 62:5,
64:25.
consideration 39:22,
53:8.
considered 48:21,
53:11.
considering 12:7,
61:25.
consistent 52:7.
constitute 12:19.
constitutes 18:24,
19:3.
Constitution
51:18.
constitutional 4:11,
25:1, 27:13,
27:15, 28:10,
28:15, 48:4, 48:5,
48:8, 51:7, 51:11,
51:13, 52:2,
58:16, 58:19,
58:23, 58:25.
construe 65:1,
65:15.
construed 21:18.
cont'd 2:1.
contemplate 61:7.
contemplates
45:14.
context 5:4, 11:16,
12:25, 21:1,
55:13, 66:19.
continual 39:2.
continually 39:4.
continue 20:19,
68:8.
continuing 7:21,
43:9.
contracts 10:10,
10:13, 20:11,
57:10.
contrary 34:23.
Control 34:16,
38:11.
conventional
13:11.
copay 7:24, 57:22.
copayments 8:3,
63:2, 63:13.

correct 28:13,
28:14, 37:2,
38:15, 44:21,
45:3, 68:19.
corresponding
14:20.
cost 8:2, 16:12,
37:8, 39:8, 53:23,
56:14, 56:16,
56:17, 56:20,
56:25.
cost-and-benefit
38:18.
cost-effective
31:22.
cost-saving 53:10.
costs 33:15, 35:9,
36:13, 39:15,
43:11.
Council 4:17, 17:15,
24:19, 25:24,
46:9, 47:23,
48:16.
counsel 3:5.
countenanced
21:19.
countries 36:14.
country 33:19,
61:13, 66:1.
couple 14:13, 22:24,
23:3, 27:2,
29:19.
coupled 58:23.
course 4:25, 5:24,
7:2, 7:8, 35:19,
42:8, 45:20, 60:1,
62:1, 62:6,
67:13.
courts 27:5, 29:3,
39:22, 47:4.
cover 6:1, 28:24,
29:10, 37:13.
coverage 8:2, 36:6,
36:7, 53:22.
covered 6:16, 8:20,
9:20, 37:7, 56:13,
65:11.
covering 31:8.
covers 8:2, 30:18,
63:15, 65:25.

COVID 7:17, 7:18,
7:24, 17:10, 22:2,
22:10, 42:18,
42:24.
COVID-19 17:1, 23:9,
35:24, 37:11,
41:5.
create 45:17.
creative 51:13.
crisis 35:21, 39:15,
42:9.
criteria 5:8.
cross 24:14.
crunch 6:20, 6:21.
cured 59:8, 62:22.
curious 40:23.
currently 16:3,
56:14.
cut 25:21, 36:13,
42:9.
.
.
< D >.
d/b/a 2:13.
damage 16:9, 34:16,
58:24.
damages 55:17.
data 34:2, 38:12.
date 19:13.
Daughters 12:6.
day 7:14.
days 64:2.
de 12:24.
deadline 6:22.
deal 60:17.
dealing 12:11,
48:24, 48:25,
52:24.
dealt 48:16.
debate 36:20.
debater 62:22.
December 18th
1:19.
decide 9:14, 60:3.
decided 6:22,
28:25.
decides 51:3.
deciding 68:1.
decision 27:10,
28:23, 29:15,

43:20, 55:14, 68:9.
decisions 9:19, 20:12.
declarants 32:14, 33:14, 33:17.
declaration 10:24, 14:12, 14:14, 15:9, 15:25, 17:22, 18:2, 32:22.
declarations 6:14, 16:16, 25:10, 31:10, 32:3, 47:15, 53:6, 55:7, 55:8, 59:14.
declared 22:10.
decline 14:16, 34:16.
declining 64:3.
decrease 39:7.
decreased 14:11.
Defendant 2:9.
Defendants 1:13, 3:16, 7:4.
deferred 41:15.
Definitely 68:10.
definition 34:18.
degree 38:22.
delay 5:2, 8:5, 8:17, 8:23, 17:9, 21:20, 41:22, 63:1.
delayed 7:5, 22:5.
delays 7:8, 21:24, 63:25.
delegated 35:6.
demonstrates 38:5.
denial 37:23.
deny 62:2.
Department 9:3, 30:6.
described 34:21.
designations 15:4.
despite 20:4, 65:20.
detail 13:2, 32:3.
detailed 10:8.
determination 23:20, 44:16, 59:6.

determine 23:23, 23:24, 51:4, 61:24.
determined 39:19.
determining 6:5, 39:23.
detrimentally 11:12.
developed 35:15.
development 58:6, 58:12.
Diana 1:29, 3:10.
difference 19:18, 61:19.
different 4:18, 10:22, 24:3, 25:18, 28:21, 29:5, 33:3, 54:15, 60:16.
difficult 18:5, 42:22, 47:10, 47:17, 55:18, 56:11, 58:11, 59:25, 60:11.
difficulties 17:10.
digest 68:9.
dire 34:5.
direct 13:10, 38:9, 46:16.
direction 21:10.
directions 5:19.
directly 44:5, 45:6.
disability 44:1.
discontinuation 16:2.
discontinue 32:21.
discontinuing 10:18, 19:20.
discuss 33:24.
discussed 6:20, 34:11, 59:18, 59:19, 59:20.
discussing 13:1.
discussion 33:23.
Disease 22:17, 35:22, 38:11.
diseases 17:1, 32:10, 35:23.

disjointed 64:19.
dispatch 8:24.
dispense 21:25, 26:12.
dispensing 5:2, 36:23.
dispute 25:20, 43:22, 43:25, 55:7.
disputes 43:19.
disputing 44:3.
disruption 6:12, 16:1, 23:25, 34:13.
disruptive 7:10, 20:12, 20:13.
distances 13:25.
distinct 18:24.
distinction 29:3.
distinctions 66:14.
distinguishable 41:4, 55:1, 58:22.
distributed 43:4.
District 1:1, 1:2, 12:5, 12:6, 12:15, 13:1, 18:22, 19:4, 30:1, 43:21, 55:15, 61:1, 61:4, 61:5, 61:6, 66:9.
doctor 17:7, 52:24, 54:15, 66:20.
doctors 12:11, 14:25, 34:7, 53:6, 64:5.
doctrine 51:25, 52:4.
document 30:6.
documented 8:19.
doing 10:22, 19:24.
dollars 9:17, 10:16, 21:5, 21:13, 35:19, 58:3.
dollars. 32:16.
done 7:17, 31:8, 35:8, 44:15, 50:8.

doors 18:1, 32:18, 34:4.
dose 37:10.
doubt 56:22.
down 8:4, 8:18, 13:15, 36:15, 52:17, 62:16, 63:3, 63:5, 63:10, 67:18.
downturns 37:14.
dozens 10:8, 31:10.
dramatically 17:25, 19:1.
drawing 66:13.
drawn 29:3.
drive 13:24.
drug 15:1, 17:20, 22:7, 26:22, 33:8, 34:11, 37:7, 38:3, 38:19, 42:9, 42:24, 53:23, 53:25, 57:21, 60:13, 63:2.
due 61:4.
duration 49:12, 50:2.
during 6:9, 10:20, 18:13, 19:24, 58:7, 63:11.
.
.
< E >.
earlier 6:21, 9:1, 22:4.
early 22:12, 68:10.
Eastern 12:5, 12:6, 66:9.
easy 21:6.
economic 7:16, 7:19, 7:22, 9:4, 17:17, 22:13, 35:15, 35:21, 37:11, 37:14, 39:18, 41:6, 53:16, 53:19, 55:5.
economically 57:20.
economist 18:3,

67:11.
economy 7:21, 21:14, 68:5.
effect 6:25, 8:13, 9:19, 11:3, 11:12, 21:12, 21:13, 23:4, 31:15, 31:16, 37:15, 39:18, 58:6.
effected 41:7, 54:4, 56:24.
effective 14:9, 15:13, 19:13, 25:13, 26:20, 32:9, 34:11, 63:6.
effects 9:15, 22:24, 30:20, 31:18, 35:24, 37:17, 41:6, 41:8, 67:19.
either 12:17, 12:19, 17:13, 38:2, 39:10, 41:20, 52:19, 63:3.
element 51:21.
elements 41:17, 49:11, 51:9, 65:16.
elicit 22:23.
eligible 37:19.
eliminate 18:15.
eliminates 54:2.
elsewhere 11:9.
ELWOOD 1:27, 3:7, 3:22, 5:15, 31:7, 32:2, 32:13, 33:6, 33:25, 36:4, 37:14, 58:16, 62:15, 62:19, 67:19.
Emergency 8:25, 9:4, 21:20, 22:11, 34:24, 42:25, 58:14, 60:25, 61:6, 61:8.
emphasize 31:3, 31:9, 63:23.
emphasized 54:10.
Employees 18:16,

19:11.
enacted 51:19.
end 24:7, 27:7, 67:14.
enforcement 34:24.
engage 56:24.
engaging 39:12.
England 15:11.
enjoin 34:24.
enough 27:16, 42:4, 42:14, 59:13, 59:15, 67:6.
enrolled 36:8.
ensure 26:19, 43:10.
enter 26:21, 62:1.
entertain 28:14, 28:15, 28:17.
entire 20:15, 52:3, 67:8.
entirely 14:2, 28:2, 32:21.
entities 25:5.
entitled 24:15.
entry 6:12.
environment 17:2.
equities 5:23, 9:12, 34:2, 59:17, 67:23.
equity 9:11.
Especially 12:10, 22:22, 29:14, 32:17, 37:17.
Esquire 1:27, 1:28, 1:29, 1:30, 1:34, 1:35, 1:36, 2:5, 2:6, 2:11, 2:15.
essential 34:9.
essentially 12:1, 56:8.
established 16:25, 65:6, 66:22.
esteemed 33:18.
estimate 9:16.
estimates 9:21, 35:17.
et 1:6, 1:11, 31:24.
evade 51:14.
evaluate 58:5.

evaluation 39:2.
event 6:2, 7:21,
    7:24, 8:7, 8:22,
    26:2, 29:10,
    63:11, 64:11,
    67:21.
everyone 3:3, 22:13,
    37:17, 42:8,
    68:7.
everything 62:8.
evidence 31:9,
    33:16, 34:23,
    36:16, 37:20,
    53:13, 53:15.
eviscerate 49:20,
    50:4, 55:20,
    56:2.
exact 41:1.
Exactly 4:21, 4:23,
    6:25, 8:15, 21:9,
    30:15, 35:8,
    38:23, 64:10.
example 33:7, 34:10,
    40:18, 44:1, 56:7,
    58:1, 63:22,
    67:20.
examples 33:13.
except 41:2, 62:8.
exception 36:17,
    39:23, 42:12,
    42:24, 46:7,
    46:10, 46:11,
    51:4, 54:7.
exceptions 21:17.
excessively 64:23.
exclusions 42:19.
excuse 40:7, 44:11,
    47:25, 51:15.
executive 22:9.
executives 33:15.
exempt 42:18.
exempts 23:9.
exercise 65:23.
exhaust 46:18.
exhausted 44:14.
exhaustion 44:7,
    47:1.
Exhibit 10:25, 15:7,
    15:10, 16:20,
    17:4, 17:18,
    18:10, 63:19.
Exhibits 17:18.
existing 6:9, 15:5,
    18:15, 46:2.
expect 8:25, 29:7,
    29:8.
expectancy 14:11,
    14:21, 15:22.
expects 18:12.
expensive 53:25.
experienced 17:6.
expert 18:3.
experts 10:14.
explain 36:15,
    50:16.
explained 37:3,
    41:8, 53:1, 57:5,
    59:5, 59:12.
explaining 10:9,
    20:4, 37:5,
    60:8.
explains 11:3,
    15:16, 37:10,
    39:12.
explanation 19:25,
    40:16, 40:19,
    63:1.
explicit 39:1.
explicitly 49:2,
    50:2.
expressly 45:14.
extensively 8:18.
extent 8:10.
extraordinary 55:21,
    56:3.
extreme 38:12.
extremely 27:13,
    32:13, 43:6,
    50:23, 52:23,
    60:11.
.
.
< F >.
face 15:20.
facing 35:21.
fact 4:12, 9:12,
    23:24, 28:24,
    37:22, 42:3,
    42:15, 42:17,
    55:20, 56:2,
58:18, 61:18,
    65:20, 66:18.
factors 5:20,
    40:5.
failure 18:7, 20:23,
    27:19, 28:18.
fall 22:18, 49:5.
falls 15:22, 21:20,
    24:13, 49:9,
    51:5.
familiar 5:5.
fancy 20:3.
far 19:2, 19:8,
    21:20, 23:14,
    30:5, 51:24,
    59:17.
fast 62:23, 67:25.
favor 9:12, 65:2.
favorable 14:20.
Favored 22:7, 23:9,
    35:18, 36:10,
    56:16, 56:17,
    56:20.
FCRR 1:44, 2:45,
    68:18.
FDA 15:3.
Fda-approved
    15:16.
Federal 1:45, 2:46,
    7:1, 21:2, 26:2.
Federation 18:21,
    19:11.
feel 4:5.
few 10:20, 10:24,
    19:22, 31:3, 40:5,
    40:21, 41:19.
field 18:3.
fight 32:10.
figures 7:22.
file 25:6, 26:22.
filed 29:19, 29:25,
    61:5, 61:7.
final 6:24, 9:2,
    18:19, 29:15,
    40:3, 43:20.
finalize 40:2, 40:8,
    59:5.
Finally 18:10,
    26:15.
financial 54:3,

56:9, 56:23.
financially 33:9.
find 15:7.
fine 52:11.
Finkelstein 1:36.
firm 18:14.
First 11:7, 11:21,
  23:17, 26:5,
  28:20, 29:25,
  30:4, 31:14,
  31:19, 36:1, 38:8,
  38:20, 43:18,
  44:10, 45:14,
  46:13, 50:11,
  51:8, 56:13,
  60:25, 67:4,
  68:3.
fiscal 21:22.
five 6:25, 10:14,
  20:14, 33:10,
  35:11.
fixed 37:17.
flag 10:24, 15:2,
  15:15.
flairs 34:15.
Floor 1:46, 2:47.
flout 46:21.
focus 13:3, 14:22.
focused 4:9, 4:13.
folks 35:23, 37:12,
  37:17, 47:18,
  56:24.
follow 26:5.
food 37:13, 37:15.
footwork 20:3.
force 11:7, 28:22.
forced 14:15.
forces 14:6,
  25:15.
forego 11:11, 18:15,
  38:3.
foregoing 14:10,
  68:19.
forever 58:11.
forgo 39:19.
form 25:1.
former 62:22.
forth 6:2, 37:21,
  47:1, 48:1.
forward 20:22,

44:18.
found 40:17, 41:5,
  42:20, 47:4,
  48:19, 52:3,
  55:18, 57:13,
  59:10.
four 5:20, 7:11,
  20:14, 42:7,
  60:24.
fraction 10:12.
frame 23:5.
framework 50:22.
frank 41:1.
frankly 56:10.
Friday 1:19.
Friday 6:24.
front 41:12, 56:5,
  60:18, 61:19,
  61:21.
fulfilling 15:20.
full 50:12.
fully 9:6, 43:1,
  62:22.
fund 67:7.
future 8:12, 18:15,
  59:9, 67:10.
.
.
< G >.
Gallo 16:16, 16:19,
  17:3.
GAP 9:15, 9:17,
  26:24, 28:2.
gather 29:17, 37:1,
  61:15.
GCCA 11:24, 13:15.
general 5:5, 24:15,
  31:18.
generally 37:6,
  53:20, 53:22.
geographic 18:8.
gerrymander 30:21.
gets 57:7.
getting 24:1, 56:17,
  56:18, 57:14.
gist 32:4.
give 9:13, 25:12,
  25:17, 26:20,
  66:20, 66:21.
Given 9:9, 13:17,

15:4, 23:2,
  64:14.
Glad 3:3, 5:16.
Global 1:32, 11:21,
  52:15.
goals 39:8, 43:11.
good-cause 8:9.
Gould 40:18, 41:10,
  41:11.
Governors 50:12.
grain 38:24.
grant 60:7.
granted 55:23.
Granting 9:13.
graphs 38:11.
great 31:8.
ground 31:7.
grounds 20:23.
group 11:22, 13:16,
  13:19.
groups 11:22.
Grower 21:17.
guess 13:2, 48:15,
  48:19, 67:15.
guilty 64:24.
.
.
< H >.
hang 23:12.
happen 9:8, 13:22,
  25:11, 53:7,
  67:12, 67:16.
happening 45:19.
happens 42:7.
happy 4:18, 5:13,
  32:3, 34:19,
  41:20.
hard 7:12, 21:9,
  30:7, 30:13,
  30:17, 30:23,
  36:22, 60:6,
  60:16, 64:3.
harder 10:21.
hardship 7:19.
harmed 31:25, 45:25,
  53:3, 55:10,
  55:11, 59:16.
harmful 63:22.
harms 12:3, 17:13,
  33:24, 38:7,

47:16, 49:1,
55:17, 57:2,
58:15, 66:5,
66:11.
Harvard 31:11.
Haven 29:1.
Health 9:15, 10:4,
14:19, 18:3,
20:16, 21:3,
22:10, 22:22,
33:3, 33:14, 55:6,
66:10, 67:11.
healthy 20:20.
hear 4:18, 4:24,
4:25, 13:6, 41:22,
49:14, 62:25.
heard 19:10.
Hearing 1:10, 1:17,
5:13, 29:25, 30:2,
60:25, 61:2.
heart 31:20.
heavily 25:11.
heightened 41:16.
held 25:23.
help 5:2, 42:5,
42:7.
helpful 31:13, 32:4,
68:8.
hereby 68:18.
HHS 25:2.
Hiatt 18:3.
high 35:10, 38:22,
43:12, 50:23,
51:5, 62:22.
highlight 34:8.
history 52:3.
hold 23:4.
holidays 7:1.
Honor 3:7, 3:14,
3:19, 12:20, 31:2,
31:13, 34:19,
35:4, 36:2, 37:2,
38:8, 40:25,
41:21, 43:14,
44:6, 44:21, 45:3,
48:14, 48:22,
52:1, 52:9, 53:17,
54:6, 56:10,
61:22, 62:4,
67:21, 68:5,

68:12.
Honorable 1:18,
68:14.
Hospital 10:2, 12:6,
18:4, 29:2,
64:17.
hospitals 11:11,
13:25, 14:1,
16:11, 65:17.
huge 38:6, 68:4.
hundred 21:13.
hundreds 19:21,
32:16, 33:12,
37:18.
hypothetically
36:12, 60:13.
.
.
< I >.
Idaho 31:23.
idea 36:14, 38:15,
40:6.
identify 3:5.
illegal 65:9.
Illinois 4:17, 46:9,
47:23, 48:16.
illusory 7:25.
imagine 20:3, 47:10,
47:17.
immediate 7:9, 8:12,
26:1, 34:14,
40:12, 53:16,
53:19, 54:3.
immediately 8:4,
31:25.
immigration 12:24.
imminent 14:17,
54:23.
imminently 21:21.
immunity 56:1.
impact 21:5, 22:14,
37:11, 56:23.
impacted 55:19.
impacting 37:12.
impacts 14:19,
55:5.
implement 40:7,
45:16, 45:18,
49:10, 60:3.
implementation 7:9,

15:25, 16:7, 20:8,
31:6, 36:10,
40:20.
implemented 49:10,
49:13.
implementing 20:14,
35:17.
important 21:1,
35:22, 39:14,
48:5, 53:2, 54:16,
54:19, 55:20,
57:14, 60:21,
61:9.
impose 45:7.
impossible 11:8,
15:12, 24:25.
improve 7:21.
improvement 15:5.
improving 43:12.
in. 56:12, 64:20.
inability 15:22,
34:16, 66:16.
inappropriate
66:21.
incentive 47:5,
47:12, 47:18.
incentives 33:2.
incentivises
53:24.
include 42:21.
included 42:23.
income 37:17.
inconsistent 45:8.
incorporates
44:23.
increase 9:22.
increased 37:13,
37:15.
increases 53:25.
increasing 39:9.
incurred 58:24.
independent 8:20.
indicate 12:7,
14:14, 18:5,
18:13.
indicated 6:14,
10:3, 14:25,
17:18, 17:21,
21:16, 29:1, 63:2,
63:13, 64:1.

indicates 18:11, 19:7, 66:19.
indicating 22:12, 22:16.
indicia 50:14, 50:16.
individual 11:23, 13:17, 47:6, 58:19.
individuals 53:4.
infeasible 33:9.
infections 22:18.
infectious 22:17.
inferior 11:9, 13:24.
infinite 57:16.
influence 19:15.
Infusion 2:3, 3:20, 31:4, 31:15, 31:16, 31:18, 31:19, 31:22, 31:24, 32:5, 32:12, 32:15, 32:20, 33:9, 34:3, 34:6, 34:22, 56:6.
initial 23:20, 55:1.
injunction 4:3, 4:6, 5:6, 7:5, 9:14, 55:23, 58:10, 61:3, 62:9, 62:10.
injunctions 30:8, 60:23.
injunctive 66:8.
injuries 58:16, 59:13.
injury 4:22, 5:25, 12:8, 12:18, 12:19, 13:5, 13:10, 14:17, 17:15, 19:3, 19:8, 19:9, 59:8, 59:12.
innovate 35:8.
innovating 50:6.
Innovation 35:7.
input 59:20.
instances 29:3.

Instead 9:24, 21:10, 24:1, 24:3, 24:14, 28:24.
Institute 16:16.
instituted 50:5.
insurance 8:16, 63:15, 63:17.
intelligible 51:24.
intend 62:5.
intended 21:11, 24:25, 29:10.
intends 24:22.
intent 50:15, 50:17, 51:8, 52:8.
interaction 45:15.
Interest 5:24, 6:7, 6:8, 6:18, 7:7, 7:13, 9:9, 9:11, 10:3, 10:5, 11:17, 11:18, 12:14, 13:12, 18:25, 24:20, 25:24, 36:19, 36:24, 37:1, 37:4, 38:7, 40:14, 40:19, 41:18, 42:14.
interested 4:15, 19:14.
interests 13:8, 53:8.
interim 6:24, 9:2, 18:18, 29:15, 40:3.
interpretation 51:1.
interrupt 8:8, 11:14, 27:20, 43:24, 63:7.
intervening 7:1.
intimate 12:9.
introduce 3:18.
invalid 29:12.
invented 26:13.
invite 21:14.
invoke 12:1, 12:3, 17:13, 52:21, 66:5, 66:11.
invoked 63:2.
involved 10:16,

48:23.
involves 50:1.
ironclad 54:8.
irreparable 4:20, 5:25, 10:7, 11:18, 11:20, 12:1, 12:8, 12:18, 12:19, 18:19, 19:3, 34:2, 34:18, 41:21, 52:10, 52:22, 54:9, 55:13, 55:17, 58:21, 59:4, 59:8, 66:22, 66:23, 67:6.
irreparably 32:1, 53:3, 59:16.
Island 19:4.
Islands 19:7, 19:17.
issue 4:16, 4:24, 6:22, 8:9, 9:15, 22:3, 23:17, 23:18, 25:5, 26:19, 28:11, 29:23, 55:4, 57:4, 61:14, 62:9, 64:21, 64:22, 65:11.
issued 9:1, 9:5, 13:20, 22:3, 22:23, 38:14.
issues 4:5, 5:3, 6:2, 16:24, 63:23, 64:21.
issuing 4:5, 22:8.
itself 9:18, 13:5, 17:14, 36:16, 39:6, 48:11, 48:16, 54:20, 57:21, 66:22.
IV 31:20.
.
.
< J >.
J. 2:15.
January 14:17, 22:11, 68:4.
Joanna 18:3.
job 31:8.
John 1:27, 3:7.

joined 3:9.
Jones 1:30, 3:10.
Joshua 15:9,
   17:22.
Judge 12:25,
   62:14.
judgment 14:10,
   17:14.
judicial 24:6,
   24:22, 26:8,
   27:17, 29:7,
   48:13, 49:20,
   49:21, 50:2, 50:5,
   50:13, 50:18,
   51:15, 51:21,
   65:4, 65:12.
judicially 49:13.
jumping 68:7.
juncture 66:25.
jurisdiction 4:16,
   5:12, 23:14, 26:3,
   26:17, 26:20,
   27:9, 36:1, 36:11,
   41:21, 43:15,
   47:7, 49:8, 49:17,
   65:2.
jurisdictional 6:2,
   26:23, 26:25,
   27:5, 27:22, 28:6,
   28:20, 43:17,
   49:7, 49:8,
   64:21.
Justice 30:6.
justification
   8:22.
justifications
   54:7.
justifies 36:16.
justify 5:1.
.
.
< K >.
Katz 15:9, 15:15,
   15:24.
Kedem 1:28, 3:10.
keep 17:25, 67:24.
keeping 5:4.
Keytruda 15:2, 15:4,
   16:10.
Kim 18:4.

kind 18:24, 30:8,
   30:20, 47:17,
   58:11, 60:12,
   63:17, 63:24,
   64:11.
kinds 60:11.
King 12:6.
known 19:14,
   41:23.
knows 67:12.
Kolber 1:35.
.
.
< L >.
Labor 9:3.
lacks 27:8, 47:7.
laid 46:8.
large 61:16.
largest 15:11,
   21:2.
last 7:20, 28:5,
   32:6, 33:5, 58:10,
   66:20.
lasts 49:25.
late 22:11.
later 6:25, 19:6,
   19:7.
law 19:16, 40:17.
layer 20:15.
lead 14:11, 34:15.
leapfrog 28:25.
least 4:7, 10:19,
   14:2, 18:18, 22:6,
   29:18, 45:18,
   53:19, 56:5,
   62:23, 66:5.
ledger 9:18.
left 30:17, 61:20.
legal 7:2, 67:16.
length 52:12.
lengthy 7:8.
less 7:23, 8:12,
   19:8, 25:13, 40:4,
   63:6.
letter 11:1, 11:3,
   14:6, 64:5.
letters 44:11.
life 14:11, 14:21,
   15:6, 15:20,
   15:22, 21:21,

   31:20, 40:12.
light 61:12.
lightly 55:23.
likelihood 6:1,
   20:21.
likely 14:8, 19:8,
   20:22, 37:22,
   56:8.
likewise 15:24.
limb 40:12.
limitation 24:5,
   30:5.
limited 54:25,
   59:24, 60:7,
   60:17, 61:10,
   61:21.
line 27:4, 30:7,
   50:15, 52:24,
   56:25, 58:4.
list 14:24, 15:1,
   25:17, 30:16,
   42:19, 42:23.
listed 14:7.
literal 64:23,
   64:24.
literally 10:15,
   13:20, 67:1.
litigate 9:14,
   67:24.
litigated 9:6,
   19:19.
litigating 58:13.
litigation 6:9,
   30:23, 58:8.
little 13:6, 15:8,
   17:12, 34:14,
   47:24, 56:11,
   64:18, 67:1.
live 15:19.
LLC 2:13.
located 31:25.
location 17:5.
locations 16:21,
   17:2, 18:1,
   18:6.
locked 10:10.
Lombard 1:46,
   2:47.
long 41:24, 49:25.
long-term 58:12.

longer 13:25,
  20:8.
look 49:23, 65:15.
looking 28:9, 32:14,
  53:10, 57:3,
  59:21.
lose 10:15, 18:12,
  31:5, 38:16,
  38:20, 55:12,
  55:25, 67:1,
  67:3.
loses 58:2.
losing 12:17,
  67:13.
loss 18:14, 34:16,
  38:1.
losses 17:14, 56:9,
  57:25.
lot 38:16, 38:17,
  42:17, 44:11,
  53:6, 55:7, 55:8,
  59:19, 62:16,
  64:13.
louder 62:17,
  62:23.
loudly 62:20.
low 9:22.
lower 16:12.
lupus 32:8.
.
.
< M >.
magnitude 18:14,
  42:2.
main 27:2.
maintaining 35:10,
  39:8, 43:12.
majority 30:15.
management 35:23.
mandatory 60:9.
manner 10:6.
manufacture 42:22.
manufacturer 18:11,
  46:23, 47:9,
  47:11.
Manufacturers 1:24,
  8:6, 10:9, 18:10,
  25:21, 46:14,
  46:16, 46:25,
  57:23.

Manufacturing 3:8.
March 22:16.
margin 17:21,
  17:23.
marginalize 17:25.
marginally 63:9.
margins 32:13.
Mariana 19:4, 19:7,
  19:16.
market 10:10, 38:23,
  42:10, 42:16.
Martin 2:15.
Maryland 1:2, 1:20,
  1:47, 2:48, 12:24,
  55:15, 60:14.
Massachusetts
  16:18.
matter 4:19, 7:23,
  33:2, 47:7,
  68:20.
matters 29:5.
Mayor 12:14, 17:15,
  66:18.
Mcorp 50:12.
mean 8:21, 20:9,
  23:25, 26:11,
  26:21, 29:6,
  30:12, 31:18,
  37:16, 43:5,
  48:15, 48:16,
  48:24, 52:2,
  54:23, 56:16,
  57:7, 57:25, 58:8,
  60:10, 61:14,
  61:25, 64:9,
  67:6.
meaning 15:4, 15:17,
  42:25.
meaningful 19:15.
means 10:18, 13:23,
  30:9, 32:12,
  45:11, 55:12,
  65:25.
measles 9:3.
measures 53:10.
mechanisms 32:2.
Medicaid 35:7, 35:9,
  37:19.
Medical 12:4, 12:25,
  14:10, 15:6,

17:14, 29:2,
  32:7.
medically 12:18,
  66:21.
medication 37:10.
medications 6:15,
  9:20, 9:23, 10:6,
  10:13, 32:6, 37:8,
  53:9, 59:21.
medicine 33:12,
  67:8.
medicines 10:10,
  10:14.
meet 57:11, 57:12.
member 18:12,
  67:3.
members 11:23, 13:8,
  13:12, 13:16,
  16:10, 30:12,
  30:14, 32:5,
  46:17, 52:17,
  52:18, 52:20.
membership 46:15,
  46:20, 46:23,
  47:14, 52:14,
  52:15, 54:13.
mention 58:16.
mentioned 7:3, 22:7,
  32:13, 33:4, 33:6,
  33:17, 37:16,
  39:16, 43:9,
  57:6.
merely 7:5.
merge 5:24.
merges 49:16.
met 39:11.
method 36:13.
MFN 6:16, 8:1, 8:7,
  8:17, 11:3, 14:6,
  14:16, 14:24,
  15:12, 15:25,
  16:7, 16:12,
  18:18, 25:11,
  25:12, 25:15,
  25:17, 26:22,
  30:16, 31:15,
  32:1, 32:11,
  34:20, 63:3,
  63:5.
Michael 1:35,

10:25.
Michigan 24:21.
migrate 25:13.
militating 40:5.
million 18:12, 36:8,
53:21, 67:4,
67:13.
millions 6:10, 9:16,
10:1, 21:5, 21:12,
32:16, 37:18,
68:2.
mind 5:4, 11:5.
minimum 10:18,
20:10, 27:8,
56:16.
minor 21:4, 66:24.
minute 8:9, 43:24,
63:7.
misnomer 30:8.
model 4:13, 27:23,
28:9, 28:21,
28:22, 34:20,
35:18, 35:19,
36:10, 38:21,
39:6, 39:11, 40:4,
45:16, 45:22,
46:2, 46:3, 49:10,
49:16, 49:22,
49:24, 49:25,
50:2, 50:4, 51:21,
60:8, 60:15,
65:24, 65:25.
models 28:7, 35:8,
45:18, 49:12,
57:11.
modify 39:10.
money 8:12, 12:17,
55:12, 55:25,
58:2, 66:21, 67:1,
67:6, 67:7.
monitor 39:4.
monitoring 39:2,
39:12, 43:10,
63:23, 64:4.
months 9:1, 10:11,
17:5, 22:3,
22:5.
mootness 54:23.
morning 3:3, 3:14,
35:4, 35:5,

52:13.
motion 6:6, 6:9,
60:25, 61:3, 61:6,
62:2, 62:5.
Motions 1:17.
move 10:21, 16:14,
17:11, 36:11,
44:5, 52:10.
moved 63:5.
Moving 20:21, 44:8,
55:5.
MR. ELWOOD 3:7,
5:16, 5:19, 6:5,
8:15, 11:7, 11:20,
12:22, 13:7,
13:14, 14:5, 20:9,
23:14, 26:10,
28:1, 28:13,
29:24, 62:21,
63:10, 68:12.
MS. SWIFT 31:2,
35:6, 37:2, 38:8,
40:25, 43:17,
44:5, 44:21, 45:3,
48:22, 52:12,
53:17, 54:6,
56:10, 57:13,
60:20, 61:22.
MS. WESTMORELAND
3:14, 35:4.
multiple 12:10,
14:23, 15:9,
15:13, 15:17,
16:2, 32:8, 33:8,
34:9, 64:3.
myself 41:25.
.
.
< N >.
name 3:15, 50:13,
66:14.
Nancy 15:10.
Napoli 16:17,
17:4.
narrow 18:15.
narrowest 20:23.
narrowly 21:18,
52:23.
Nation 21:2, 22:7,
23:9, 35:18,

36:10, 42:3, 52:3,
56:16, 56:17,
56:20.
National 2:3, 3:20,
18:21, 31:4.
nations 35:15,
39:17.
nationwide 30:7,
30:18, 60:9,
60:23, 65:20,
65:21.
near 27:16.
necessarily 51:11,
52:1.
necessary 27:24.
need 4:19, 5:15,
6:15, 20:19, 21:7,
26:6, 26:15,
27:21, 43:3, 43:7,
51:12, 57:10,
58:5, 58:7, 62:16,
64:14.
needed 10:5, 22:15,
60:9, 64:7.
needs 51:3, 62:8,
64:2.
negative 14:18.
nerve 34:16.
net 11:10, 16:11,
17:23.
Network 11:24,
14:14.
neurologic 16:9.
neurological
16:17.
neurologist 15:10,
33:19.
neurologists
31:10.
nevertheless 13:15,
26:19.
New 9:8, 15:11,
17:3, 17:7, 29:1,
29:19, 35:8,
35:25, 36:13,
38:9, 38:12,
39:17, 42:3,
42:17, 43:1, 50:6,
57:12, 57:18,
61:1, 67:8.

next 30:2, 61:2,
   61:4, 67:13,
   68:9.
NICA 31:4, 31:22,
   32:5.
night 7:20.
nine 38:19.
NO. 1:9.
nobody 53:7.
nondelegation 51:25,
   52:4, 52:6.
None 46:14, 46:15.
nonetheless 5:11.
nonproviders 26:1.
normal 15:19, 28:25,
   45:20.
North 21:16, 29:2.
Northern 1:2, 19:3,
   19:7, 19:16,
   61:4.
note 14:12, 16:9,
   29:11, 33:6,
   39:14, 62:4.
noted 7:25, 10:2,
   25:10, 58:23,
   60:24, 62:4.
notes 15:12, 17:4.
nothing 7:17, 52:4,
   55:12, 64:16,
   67:23.
notice 4:10, 4:14,
   5:2, 10:20, 18:19,
   19:22, 20:1,
   20:24, 27:25,
   28:12, 28:18,
   33:10, 37:3,
   39:19, 41:19,
   59:2.
notice-and-comment
   20:25, 21:7,
   21:18, 27:19,
   28:25, 29:13,
   36:23, 38:5, 40:9,
   57:7, 63:21.
notice-of-comment
   21:25.
NPR 7:20.
number 18:16, 36:3,
   37:24, 47:15,
   47:20, 55:11,

59:14, 61:16,
   61:23.
numbers 44:12.
numerous 10:14,
   14:16.
.
.
.
< O >.
Oaks 29:2.
obligations 64:4.
observations 4:1.
obtaining 10:5.
obvious 5:3.
Obviously 4:2, 4:15,
   4:19.
occasions 22:24.
occurring 42:2.
Ocrevus 15:15,
   15:16, 16:10,
   17:7, 33:7, 33:9,
   64:1, 64:14.
offer 37:24.
offered 34:23.
office 6:24.
Official 1:45, 2:46,
   68:24.
often 17:8, 17:19,
   32:6, 32:18.
Okay 3:12, 3:24,
   6:4, 12:21, 13:13,
   14:4, 23:13,
   30:25, 43:15,
   54:5, 62:11,
   62:21, 63:10.
On-site 2:13.
oncologist 10:24,
   14:5.
oncologists 11:1,
   31:11.
Oncology 11:3, 14:7,
   14:14, 14:15,
   14:23, 14:24.
One 3:20, 5:3, 7:13,
   9:22, 11:9, 13:15,
   15:2, 15:11,
   15:15, 16:12,
   18:11, 22:4, 27:1,
   28:6, 33:20, 34:8,
   38:25, 39:8,
   42:20, 43:19,

48:13, 49:7, 49:8,
   52:14, 60:7,
   60:14, 67:2,
   67:20.
one-to-one 65:25.
one. 28:4.
ongoing 43:10.
open 18:1, 32:20.
operate 17:21,
   17:22, 32:12.
operations 31:15,
   31:19.
opportunity 57:17.
opposed 6:18, 9:10,
   66:7.
opposite 21:10.
opposition 8:6,
   18:21, 24:3,
   24:11, 41:13,
   61:2, 63:4.
option 19:5.
options 11:8, 15:18,
   33:4.
order 5:7, 5:23,
   22:9, 23:16,
   26:19, 29:23,
   55:22, 58:9,
   60:17, 61:4,
   61:14, 61:20,
   61:25, 62:1, 62:3,
   62:6, 62:9,
   64:20.
organization 46:17,
   46:22, 46:24,
   52:15, 52:16,
   54:13, 61:16.
organizational 4:22,
   13:1, 13:4.
organizations 46:15,
   46:20, 47:14,
   52:14, 52:17,
   52:18, 52:19,
   54:14, 60:18.
others 10:9.
Otsuka 55:15.
outcome 7:6.
outcomes 11:13,
   14:8, 14:21,
   34:6.
outlined 52:8.

outside 24:13.
overall 50:9.
overcome 50:14,
  50:18.
overlook 6:3.
overwhelmingly
  32:11.
own 9:16, 9:21,
  21:24, 23:17,
  31:21, 37:25,
  39:25, 54:19,
  58:25.
.
.
< P >.
P. 1:27.
page 8:5, 11:2,
  24:11, 63:4.
paid 10:13, 24:1,
  56:15.
pandemic 9:4, 10:21,
  19:24, 22:13,
  22:14, 22:24,
  35:24, 37:11,
  39:19, 41:5, 41:7,
  41:24, 42:1,
  42:5.
papers 7:8, 10:2,
  68:9.
Paragraph 15:7,
  15:23, 15:24,
  16:5, 16:19, 17:9,
  18:11, 18:13,
  63:19.
paragraphs 14:13.
parameters 49:12,
  51:9.
Part 8:3, 17:20,
  23:20, 23:21,
  23:24, 24:13,
  24:24, 26:5,
  35:13, 36:8, 38:7,
  38:17, 38:21,
  44:12, 44:16,
  45:6, 49:18, 60:8,
  65:8, 66:1,
  68:4.
partially 56:11.
particular 5:1, 9:2,
  11:4, 15:2, 15:15,

19:1, 25:5, 30:23,
  34:8, 41:9, 44:4,
  48:5, 61:17,
  61:23, 65:16,
  65:18.
particularized
  18:25.
particularly 18:5,
  21:1, 61:12.
parties 9:13, 53:2,
  54:8, 54:22,
  59:24, 61:11,
  61:21.
partly 13:5.
parts 49:3.
party 5:25, 54:9,
  54:18, 66:7.
patient 11:12,
  11:21, 11:22,
  13:16, 14:8,
  52:15, 52:20,
  52:25, 54:11,
  54:12.
pay 8:14, 57:22.
paying 8:11, 35:14,
  35:16, 36:14,
  39:17.
payment 18:5, 36:13,
  45:22, 50:6,
  53:24, 54:1,
  57:22, 63:14.
peer 24:15.
penalizes 25:11.
pendency 58:8.
Pennsylvania 7:7,
  60:15.
people 8:11, 10:21,
  19:22, 20:10,
  20:16, 20:17,
  21:5, 30:20, 38:1,
  39:17, 41:7, 42:5,
  50:1, 50:7, 60:18,
  63:5, 63:14, 64:2,
  64:14, 68:2.
percent 8:1, 8:16,
  9:22, 17:23,
  32:14, 35:11,
  35:13, 38:19,
  53:20, 53:22,
  56:13, 56:15,

56:18, 63:14,
  63:16, 65:19.
percentage 36:5.
perfectly 22:13.
performing 54:16.
Perhaps 5:9,
  11:15.
period 20:8, 38:6,
  63:12, 64:12.
permanent 16:8,
  19:23, 34:5,
  34:17.
permits 26:1,
  28:7.
permitting 19:12.
person 66:17.
persons 19:14.
perverse 30:20.
Pharma 16:10, 18:12,
  30:14, 46:24,
  67:3.
Pharmaceutical 1:24,
  3:8, 25:21, 46:14,
  46:16, 46:23,
  46:25, 47:8,
  47:10, 55:15,
  61:16, 61:17.
phase 7:11, 65:21.
phase-in 40:4, 42:6,
  42:11.
phased 42:15,
  56:12.
phasing 20:14,
  57:6.
phonetic 40:18,
  41:11.
phrase 51:1.
physical 19:23,
  21:21.
physicians 16:25,
  47:4, 47:11.
PI 6:6, 6:9, 9:6,
  30:22, 67:24.
pipeline 29:24.
place 53:5.
places 16:7.
plain 23:18.
Plaintiff 1:24,
  1:32, 2:3, 18:25,
  24:12, 49:14,

51:7, 55:6, 55:24,
62:2, 62:8.
plan 5:20, 7:9,
7:13.
plans 10:19.
plausible 51:2,
51:3.
play 61:10.
plead 51:14,
64:24.
Plus 56:18.
point 8:10, 9:2,
16:15, 18:10,
20:6, 22:1, 22:6,
31:19, 32:19,
34:8, 36:2, 36:16,
38:20, 39:20,
40:10, 49:21,
58:17, 64:13,
66:24, 67:10.
point. 41:22.
pointed 67:23.
points 31:14, 38:8,
40:21, 41:19.
population 37:5.
position 60:2,
60:22, 62:7.
possibility 16:13.
possible 68:10.
posture 5:21.
potential 26:17.
potentially 8:10,
54:16, 60:22.
practices 11:1,
14:7, 14:15,
64:5.
precedent 11:25,
45:8, 50:24.
preclude 24:24,
28:8.
predicting 22:17.
preference 23:15.
preferred 7:6.
pregnancy 54:24.
preliminary 4:1,
4:3, 4:5, 5:6,
7:5, 9:14, 13:18,
55:22, 58:10,
61:3, 62:9, 62:10,
66:11.

prerogative 62:7.
prescribe 53:24.
prescribed 9:24.
present 14:2,
54:9.
presented 44:14,
53:13, 53:15,
60:4.
presenting 3:22.
presently 15:19.
presentment 23:16,
23:18, 44:7,
51:16, 51:18,
64:22, 65:11.
preserve 6:6, 9:25,
60:19.
preserving 6:8.
President 7:3, 22:7,
22:15.
presumably 50:5,
58:10.
presumption 24:22,
27:14, 29:7,
50:13, 50:14.
pretty 18:22, 20:22,
66:23.
prevail 7:4.
prevent 4:8.
previous 65:23.
price 24:1, 56:14,
57:21, 60:14,
60:16.
prices 8:7, 10:10,
37:13, 37:15,
57:15, 63:3.
pricing 22:8, 46:2,
57:11.
primary 15:17,
33:8.
principle 51:24,
58:25.
principles 5:6,
5:11, 61:10.
probably 28:4,
57:16.
problem 27:3, 36:25,
61:24.
procedural 4:22,
13:5, 48:3, 59:8,
59:11.

procedure 54:17.
procedures 18:23,
18:24, 55:4.
proceed 5:25, 14:3,
20:19, 20:23,
28:18, 29:12,
29:15.
proceeding 9:10,
18:18, 20:4,
24:3.
Proceedings 1:17,
68:16, 68:20.
process 19:15,
25:22, 26:13,
44:22, 46:19,
47:13, 47:18,
47:24, 48:1.
production 67:8.
productive 15:20.
professors 31:11.
profit 17:23,
58:1.
profit-hungry
33:14.
profits 58:2.
program 7:10, 21:2,
35:9, 68:2.
progression 32:10.
progressive 15:17,
15:21, 33:8.
prohibit 27:18.
prohibition 54:21.
projects 18:15,
18:16, 66:3.
prompt 6:3, 6:11.
promulgated 25:2.
promulgation 29:4.
prongs 5:6, 39:11.
proper 49:19.
properly 28:11,
36:12, 51:17,
51:19, 51:20.
property 21:21.
proposed 22:23.
proposition 38:19,
58:20.
protect 33:21.
provide 7:16, 7:18,
20:10, 32:25,
40:16, 64:7,

66:16.
provided 10:7, 10:9,
    31:10, 34:7,
    58:24.
provider 46:17,
    46:21, 52:20,
    54:11, 54:12.
providers 6:14,
    8:19, 10:8, 11:25,
    12:9, 12:13,
    12:16, 13:9,
    13:23, 16:14,
    17:11, 17:12,
    17:17, 25:7,
    25:14, 31:7,
    32:17, 33:3,
    37:24, 46:16,
    46:21, 47:14,
    47:15, 52:19,
    53:24, 55:6,
    66:10.
providing 12:17,
    28:12.
provision 24:4,
    26:7, 65:16.
provisions 23:23,
    24:2, 24:15, 49:4,
    49:5, 65:4.
public 5:24, 7:13,
    9:11, 10:3, 10:5,
    11:16, 11:17,
    21:15, 22:10,
    36:19, 36:24,
    37:1, 37:4, 38:7,
    40:14, 40:19,
    41:18, 42:14.
purchase 16:11.
purely 4:22.
purpose 16:15,
    45:17.
purposes 4:7, 4:14,
    14:2, 23:6, 27:21,
    27:25, 46:3,
    58:21, 66:11.
pursue 47:6.
pushing 33:3.
put 5:3, 9:11,
    12:16, 20:22,
    28:23, 29:24,
    34:14, 60:22,

66:20, 67:2,
    67:5.
puts 28:22.
.
.
< Q >.
quality 35:10, 39:9,
    43:12.
question 4:21, 27:6,
    27:22, 28:3,
    28:16, 38:9,
    48:14, 49:16,
    50:7, 51:12, 59:3,
    59:7, 65:3.
questioning 49:22.
questions 5:20,
    29:20, 34:20,
    52:9.
quibbling 65:16.
quickly 68:7.
quite 5:9.
quo 6:6, 9:25,
    26:19.
quote 11:7, 14:5,
    14:6, 14:18,
    15:16, 15:25,
    16:6, 16:20, 17:7,
    17:24, 21:4, 24:6,
    24:7, 24:11,
    24:15, 26:1, 27:6,
    27:7.
quoted 14:25.
.
.
< R >.
Rachel 2:11, 3:15.
raising 27:18,
    65:19.
rapid 23:10.
rate 9:23, 37:19.
rather 24:23, 25:25,
    46:2, 48:10.
reach 27:22.
reaching 19:2,
    27:24.
read 11:4.
reading 16:6, 45:8,
    64:23, 64:25.
ready 4:6, 4:11,
    52:1.

real 17:17, 44:9.
reality 31:6, 34:21,
    57:17.
really 18:20, 23:6,
    23:12, 24:8, 26:6,
    30:10, 30:23,
    51:12, 51:19,
    56:18, 62:8,
    62:24.
reason 23:2, 26:11,
    27:3, 42:4, 42:20,
    43:7, 44:12,
    47:25, 54:21,
    57:7.
reasonable 50:25.
reasons 23:3, 27:2,
    30:7, 33:25,
    44:10, 45:13,
    49:6, 57:24,
    60:11, 62:2, 63:2,
    66:13.
rebound 34:15.
rebut 31:9, 40:21.
rebuts 40:6.
rebutted 8:1,
    66:9.
receive 34:9.
received 25:8.
recent 12:24,
    55:14.
recently 38:13.
receptive 19:9.
recipients 64:6.
recognize 6:23,
    51:25.
recognized 20:25,
    55:16.
recognizes 23:10,
    55:17.
recognizing 35:20.
record 3:6, 68:20.
recoup 42:10.
recovery 56:1.
reduce 8:6, 9:20,
    18:16, 23:3, 35:9,
    37:10, 56:25.
reduced 36:9,
    43:11.
reduction 7:24,
    14:19, 14:20,

17:23, 17:24,
18:5.
reference 24:14.
referenced 41:3.
references 11:10.
Regardless 31:24,
34:1, 44:18,
44:22.
regime 67:17.
regimen 34:13.
regimented 17:8,
34:10.
regular 20:20.
regulations 24:24,
25:18.
regulators 21:6,
22:21, 22:22.
regulatory 7:6,
19:1, 19:2.
reimburse 25:25.
reimbursed 10:12,
46:1.
reimbursement 6:9,
25:7, 25:14,
25:18, 25:23,
26:22, 38:7,
44:17, 44:20,
46:1, 46:18.
reimbursements
17:20, 17:24.
reiterate 67:22.
rejected 22:2.
relapse 16:8.
related 29:20.
relating 4:2,
51:9.
relationship 12:2,
49:4, 54:10,
54:11, 54:12,
54:15, 54:21.
relationships 12:10,
16:25.
relatively 66:24.
relentlessly
15:20.
relevant 34:3,
42:16, 43:8,
43:18, 48:18,
58:21.
reliance 21:24,

22:2.
reliant 17:20.
relied 24:21.
relief 7:16, 7:18,
26:20, 30:5,
53:16, 57:14,
59:22, 59:23,
61:8, 61:10,
61:25, 66:8,
66:12.
relies 4:17.
reluctantly 21:19.
rely 41:5, 49:15.
relying 13:5, 26:7,
36:25, 40:23,
41:10, 48:19.
remain 20:20,
32:20.
remedy 55:21,
56:3.
remember 6:1,
66:6.
renegotiate 10:13,
20:11, 57:10.
repeatedly 27:5.
reply 22:16, 58:20,
62:8.
report 22:16.
Reported 1:42,
2:43.
reportedly 63:22.
Reporter 1:45, 2:46,
62:14, 63:8, 63:9,
68:24.
represent 11:19,
13:8, 13:17,
13:19.
representational
4:23, 13:1.
represented 61:18.
represents 15:5,
31:22.
request 22:23.
required 30:6,
40:15, 41:14,
41:17, 44:15.
requirement 24:19,
28:25, 42:12.
requirements
43:23.

requires 6:7, 39:6,
39:10, 40:1,
40:15, 43:20,
44:2, 44:24.
requiring 41:16.
Research 1:24, 3:8,
18:15, 58:6,
58:12.
resolve 40:3.
resolved 6:6.
resort 32:6, 33:5.
respect 24:6, 48:4,
51:7, 59:6, 59:22,
66:4.
respects 11:20,
54:3.
respite 68:1.
respond 38:23.
responding 8:25.
response 9:4.
responsible 68:4.
restraining 5:7,
29:23, 55:22,
58:9, 61:3,
62:6.
restraint 21:10.
result 6:21, 15:19,
15:21, 16:1,
19:17, 37:22,
37:23.
resulting 14:19.
results 11:12.
retired 7:22.
retraining 62:3.
revenue 18:14.
reverse 5:22.
review 20:1, 24:6,
24:15, 24:22,
25:6, 25:22, 26:1,
26:8, 27:7, 27:18,
29:8, 29:9, 44:2,
46:12, 47:3, 47:6,
48:13, 50:3,
50:13, 50:18,
50:23, 51:15,
51:22.
reviewed 27:5,
49:13.
rheumatoid 32:8.
rheumatologist

32:22.
rheumatology
    33:19.
Richmond 12:4.
ride 42:1.
rights 18:20.
ringing 64:10.
rise 38:12.
risk 16:8, 18:24,
    19:23, 21:21,
    34:14, 35:24.
risks 20:5.
road 36:15.
Robert 1:30.
robust 10:3.
rollout 7:3.
rotating 10:7.
RPR 1:44, 2:45,
    68:18.
rulemaking 19:15,
    20:2, 20:25, 21:8,
    21:18, 27:19,
    56:24, 63:21.
rulemakings 40:1.
rules 14:6, 29:4,
    29:5.
rung 13:15, 52:17.
rural 18:1, 18:6,
    18:7, 31:23,
    32:17.
rush 7:15, 7:16.
rushed 31:6.
rushing 23:2.
.
.
< S >.
S. 1:35.
safe 31:21.
safeguarding 10:4.
safety 11:10,
    16:11.
sales 24:1.
Salfi 45:9, 48:19.
salt 38:24.
Salvatore 16:17.
sane 67:25.
satisfied 39:24.
save 35:18, 35:19.
saving 31:20.
saying 4:8, 8:12,

28:8, 32:14,
    48:19, 49:22,
    50:3, 50:19,
    55:16, 56:21,
    61:23, 64:6,
    66:15.
says 4:16, 10:5,
    12:16, 14:18,
    15:24, 16:6,
    16:19, 16:20,
    19:12, 24:5,
    37:14, 44:8,
    65:13, 67:3,
    67:11.
scale 42:14, 45:19,
    51:6.
schedule 17:8,
    34:10, 34:12,
    67:25.
scheduled 61:1.
scheduling 6:20,
    32:24.
scheme 6:10, 19:2,
    22:8, 25:4, 25:25,
    39:13, 47:1,
    47:19, 47:22.
schemes 50:7.
school 62:22.
sclerosis 12:10,
    14:23, 15:9,
    15:13, 15:17,
    16:3, 32:8, 33:8,
    34:9, 64:3.
scope 29:22, 49:12,
    50:1, 50:4, 51:9,
    59:22, 61:19.
screen 3:4.
Second 12:22, 14:5,
    19:3, 21:2, 22:18,
    24:18, 31:16,
    32:19, 45:24,
    49:8, 49:19.
Secretary 7:3, 25:2,
    27:9, 29:4, 39:10,
    43:20, 44:15,
    45:15, 45:17,
    49:3, 49:13, 50:8,
    51:20, 56:23.
Section 23:19,
    24:23, 39:3, 39:7,

43:19, 43:20,
    43:23, 44:3, 44:9,
    44:11, 44:23,
    45:5, 45:14,
    45:17, 49:2, 49:4,
    49:9, 49:11,
    52:8.
Security 24:8,
    44:1.
seeing 36:23,
    47:13.
seek 26:1.
seeking 61:7.
seems 48:11, 57:9.
Seiden 10:25,
    14:12.
selection 28:20,
    49:11, 65:14.
sending 16:20.
senior 57:19.
seniors 35:18,
    35:21, 36:3, 36:7,
    36:8, 37:6, 37:15,
    38:16, 41:9, 42:8,
    54:3, 57:14,
    57:19.
sense 20:10, 42:21,
    46:3, 48:8,
    60:10.
sentences 11:4.
separate 13:3.
serious 15:6.
seriously 20:7,
    64:4.
Services 16:23,
    21:4.
set 6:22, 25:18,
    34:12, 47:1, 48:1,
    49:7, 65:9.
seven 21:13.
seven-year 7:10.
several 29:18.
severe 37:11.
shall 24:6.
sharing 8:3.
shielded 27:7.
shift 41:20, 57:8.
short 6:19, 21:20,
    41:14, 63:24.
short-term 37:22.

shortened 15:22.
shortly 22:9.
shortness 13:18.
show 19:17, 23:11,
  36:18, 55:24,
  59:15.
showing 38:12.
shown 40:13.
shows 21:7.
side 9:18.
sight 31:5.
signals 64:11.
signed 11:1,
  22:12.
significant 14:18,
  18:8, 19:22,
  19:23, 22:11,
  23:8, 56:9, 58:4,
  59:13.
significantly 10:19,
  19:20, 42:9,
  55:10.
similar 29:18,
  35:15.
Similarly 65:12.
simplification
  24:16.
Simply 27:20, 33:5,
  33:16, 37:24,
  50:3, 58:24,
  59:13.
single 67:2.
Singleton 53:1,
  66:6.
situation 21:20,
  41:1, 48:24.
six 22:5.
skyrocket 43:7.
slightly 13:2.
Slow 62:16, 63:10,
  67:18.
slowly 62:20.
small 17:19, 31:11,
  31:23, 32:18,
  33:18, 36:3, 36:5,
  55:25.
smaller 55:4.
Smith 17:22.
so-called 30:7.
Social 24:7, 44:1.

Solutions 2:13.
somebody 67:12.
somehow 40:3,
  42:7.
someone 55:2.
sometimes 35:14,
  47:23.
somewhere 36:15.
soon 68:11.
Sorenson 21:22.
sorry 8:8, 11:14,
  14:13, 28:3,
  37:20, 62:21.
sorts 30:19.
sounds 20:5.
sources 38:2.
Southern 30:1,
  61:1.
sovereign 56:1.
speaking 3:9, 3:13,
  3:15, 37:6.
speaks 27:14.
specialists 22:17.
specific 25:8, 27:1,
  28:6, 42:13,
  42:19, 52:24.
specifically 27:17,
  27:23, 32:8,
  37:16, 48:7,
  50:10, 58:22,
  64:21.
speed 40:19.
spending 21:14,
  35:13, 65:20,
  67:14.
Spiegel 63:19.
squarely 41:2.
stable 6:11, 10:1,
  16:3, 68:3.
stage 5:9, 13:18.
stakeholders
  21:12.
stand 34:17.
standard 50:23,
  52:22.
standing 4:20, 4:23,
  5:12, 13:2, 13:4,
  13:8, 13:11,
  33:24, 33:25,
  43:4, 61:11,

66:7.
stands 38:19.
Stanton 1:30,
  3:10.
start 3:4, 5:13,
  10:21, 57:14,
  62:24, 64:3,
  64:17.
started 37:5.
starting 3:5, 6:8,
  23:16.
state 53:18.
stated 45:9, 62:2.
statement 50:17,
  59:15.
statements 55:9,
  56:7, 57:24.
States 1:1, 35:14,
  35:16.
status 6:6, 9:25,
  26:19, 29:21.
statutes 44:12,
  65:2.
statutory 4:12,
  25:1, 39:8, 43:11,
  46:2, 50:11,
  50:22, 51:4,
  51:14, 52:7,
  54:1.
stay 8:21.
stenographic
  68:19.
Sterk 1:29, 3:10.
stop 16:5.
story 7:20.
strategies 39:5,
  58:7, 58:13.
Street 1:46, 2:47.
stretch 37:12.
strict 45:7.
strictly 65:1,
  65:15.
strong 24:22, 27:14,
  29:7, 29:14.
structural 58:18,
  58:20, 58:25,
  61:10.
structure 35:15.
student 22:19.
sub 54:13.

Subchapter 24:7, 24:9, 24:13, 24:18, 26:8, 26:12, 26:13, 45:2, 45:4, 45:10, 48:17, 48:18, 48:21, 65:5, 65:9, 65:10.
Subject 5:19, 7:2, 16:12, 42:25, 47:7, 60:15.
subjecting 17:13.
submission 19:12.
submit 25:14, 25:23, 33:24, 45:25.
submitted 47:15, 55:8, 59:14, 64:5.
submitting 19:6, 25:16.
subset 26:18.
substance 29:4.
substantial 6:17, 15:5.
substantive 45:11, 45:21, 46:4, 48:4, 48:9, 48:22, 65:7, 65:10.
substitute 14:7, 19:13, 24:16.
success 6:1, 20:21.
suffer 17:17, 55:6, 56:9, 56:22.
suffering 32:6, 59:3, 59:8, 59:12, 59:13.
sufficient 4:4, 16:22, 39:19, 47:5, 47:12.
sufficiently 55:19.
suggest 33:17.
suggesting 33:14.
suggests 37:21.
suing 65:7, 65:8.
suit 46:22, 66:14, 66:15.
summary 31:5, 34:19, 41:14.

Summit 2:13.
super 66:6.
Supplemental 8:2, 8:16, 36:6, 36:7, 53:22, 63:15, 63:17.
support 11:24.
supported 11:1, 40:17.
supporting 9:11.
suppose 56:2.
supposed 7:18, 65:21.
Supreme 21:3, 24:21, 45:8, 45:9, 50:11, 52:23, 53:1, 54:10, 54:20, 54:24.
surer 9:7.
surge 7:17, 7:18, 35:25, 38:9, 39:18, 42:2, 42:3, 57:18.
survive 20:1, 27:13.
swear 16:5.
sweeping 65:23.
Swift 2:5, 3:21, 31:1.
switch 8:19.
sworn 56:7.
symptoms 15:21, 34:17.
.
.
< T >.
T. 1:44, 2:45, 68:23.
talked 17:12, 23:1, 36:5.
talks 64:20.
tangentially 48:23.
taps 29:9.
targeted 32:11.
technically 45:19, 47:2.
tempered 38:25.
temporary 5:7, 29:22, 55:22,

58:9, 61:3, 62:3, 62:5.
ten 12:12.
tends 23:11.
tens 10:19, 19:21, 35:18.
terminate 39:10.
terms 11:17, 23:17, 23:18, 39:11.
terribly 58:3.
test 5:7, 27:9, 27:11, 27:24, 28:9, 28:17, 30:19, 34:20, 45:6, 45:19, 47:2, 47:3, 49:18, 60:12, 60:19, 65:5, 65:9, 65:14, 65:17.
testimony 34:7.
tests 28:7, 65:21.
Texas 10:2.
text 48:10.
textual 45:8.
Thanksgiving 6:25.
themselves 3:6, 3:18, 12:13, 13:16, 25:4, 53:5.
theoretically 45:25.
therapies 9:24, 15:5, 32:5.
therapy 15:16.
they'll 9:24, 32:18, 54:1, 67:10.
they've 7:17, 21:10, 25:8, 55:8, 66:2.
thin 17:21.
thinking 6:15, 22:19, 32:8.
thinks 50:25, 59:23.
third 31:17, 54:9, 54:18, 54:22, 66:7.
third-party 52:22.
Thomas 16:16, 17:3.

thorough 5:9,
  5:10.
Though 11:15, 19:5,
  29:11, 32:19,
  36:12, 41:3, 48:6,
  60:24, 62:1.
thousands 10:15,
  10:20, 16:2,
  19:21, 33:12.
threat 40:12.
threaten 21:21.
threatening 15:6.
three 11:11, 13:20,
  31:13, 40:3,
  59:7.
threshold 4:16,
  4:19, 27:6, 28:16,
  36:2.
throw 55:10.
thumb 51:5.
tie 7:17.
tied 36:13, 41:6,
  41:7.
ties 4:20.
tight 32:13.
tighten 67:15.
Tim 3:19.
timely 10:6.
timing 47:22,
  57:25.
Timothy 2:6.
tinier 66:3.
Title 12:14, 12:15,
  66:19.
today 3:9, 3:16,
  13:20, 40:11,
  60:4.
together 23:4,
  23:12.
Transcript 1:17,
  68:19.
transformational
  6:23, 21:11,
  21:12, 57:8.
transition 6:15,
  17:5.
transportation
  16:24.
travel 18:9.
treat 11:2, 31:12,

31:17, 34:4,
  64:6.
treating 12:9,
  16:25, 32:21.
treatment 6:13,
  9:19, 10:19, 11:9,
  11:10, 11:11,
  12:17, 13:24,
  14:9, 14:16,
  14:23, 15:3,
  15:11, 15:18,
  16:2, 18:7, 19:21,
  19:23, 23:9,
  32:24, 34:13,
  66:21.
treatments 10:16,
  17:24, 25:13,
  31:21, 33:1, 33:4,
  33:5.
TRO 4:2, 4:6, 4:13,
  5:4, 5:9, 5:22,
  6:12, 7:5, 9:11,
  9:13, 9:25, 23:7,
  26:21, 27:21,
  27:25, 30:22,
  60:7, 62:10.
trouble 37:8.
true 41:24, 47:2.
Trump 7:7, 22:7.
try 6:1, 10:23,
  17:6, 52:21,
  62:23.
trying 30:20, 42:10,
  45:7, 52:24,
  68:7.
Tuesday 61:2,
  61:5.
tumors 15:3.
turn 29:9, 35:2.
turns 7:13.
twice 35:14.
Two 6:13, 7:1, 8:20,
  11:4, 11:9, 11:20,
  14:22, 15:13,
  22:3, 34:14, 38:8,
  38:25, 39:11,
  43:17, 43:23,
  44:6, 44:10,
  45:13, 52:2.
type 17:9, 20:3.

types 15:3, 19:20.
Tysabri 34:10.
.
.
< U >.
ultimately 7:4,
  28:8, 36:21, 41:5,
  55:18.
ultra 50:10, 50:19,
  50:21, 50:24,
  51:4.
umbrella 16:20.
unable 34:4.
unavailable 18:7.
uncertainty 38:22.
unclear 17:2.
underlying 46:12.
undermine 23:10.
understand 11:16,
  36:17, 48:15,
  56:21, 57:15.
understanding 9:7,
  36:25, 60:6.
understood 28:3.
undertaking 19:1.
unfamiliar 13:25.
unhappy 25:7.
United 1:1, 33:20,
  35:13, 35:16.
unless 13:22, 27:14,
  52:9.
unmute 5:15.
unnecessary 16:8.
unquote 14:11,
  15:23, 16:4, 16:9,
  17:3, 21:7.
unsustainable
  32:25.
untenable 11:8.
until 6:6, 64:12,
  67:14.
unusual 5:21.
upset 45:21.
Urological 24:20,
  25:24.
users 38:20.
using 8:1, 25:12,
  33:12, 40:6.
usual 5:22, 16:14.
Utah 31:24.

.
.
< V >.
v. 41:11, 45:9,
   50:12, 53:1,
   66:6.
valid 27:4, 28:16.
validity 60:19.
variety 34:7.
various 4:9.
versus 6:8, 7:7,
   21:3, 24:21.
viable 33:4.
video 3:4.
view 28:10.
viewpoint 4:18.
views 19:13,
   19:14.
violated 52:3.
violates 51:25.
violation 4:10,
   58:23.
vires 50:10, 50:19,
   50:21, 50:24,
   51:4.
Virginia 12:5,
   16:16, 66:10.
vs 1:9.
vulnerable 18:6.
.
.
< W >.
W. 1:46, 2:47.
wait 67:14.
waivable 44:8.
waive 23:22, 24:2,
   49:3.
waived 46:3.
waiver 51:20.
walk 15:22.
wallets 42:9.
wanted 10:23, 14:6,
   14:12, 14:22,
   15:2, 17:11,
   18:10, 22:6,
   23:15, 26:12,
   43:2, 44:6,
   62:15.
water 32:16.
wave 22:18.

ways 21:6, 51:13.
weakness 9:9.
week 30:2, 68:3,
   68:10.
weeks 6:13, 6:25,
   10:14, 10:20,
   13:20, 17:5,
   19:22, 20:15,
   33:10, 34:14.
weighing 6:7.
Weinberger 45:9.
well-established
   43:6.
Westmoreland 2:11,
   3:15, 35:3, 56:4,
   62:12, 62:13,
   64:20.
whatever 41:21,
   53:14, 56:20.
Whereas 41:8,
   54:25.
whole 23:11, 25:25,
   26:11, 26:14,
   39:3, 42:19,
   45:16, 66:1.
wholly 66:17.
widely 43:3.
wild 42:1.
wish 53:4.
wished 33:15.
within 40:2, 40:3,
   49:9, 59:7.
without 18:23,
   28:12, 41:16,
   55:13, 57:25.
woman 54:15,
   54:17.
words 25:16, 52:6.
work 30:19, 30:20,
   60:6, 64:15.
worse 14:8.
worst 7:4.
Wulff 53:1, 66:6.
Wyoming 31:24.
.
.
< X >.
x-ray 17:4.
XI 24:13, 24:18,
   26:13, 65:9,

   65:11.
Xinis 12:25.
XVIII 24:7, 24:10,
   26:12.
.
.
< Y >.
Yale 29:1.
year 9:8, 9:22,
   56:13, 66:20,
   67:4, 67:13,
   67:14.
years 7:11, 10:11,
   12:12, 20:14,
   21:13, 40:3, 42:7,
   59:7.
York 29:19, 61:1.
.
.
< Z >.
zero 56:17.
Zimmitti 1:34.
Zoom 1:10.